Raymond W. HUDSON, Jane Imdahl, Larry Schuhardt, Nola Bunkley, Linwood Lamb, Kenneth Martin, et al.

v.

## GENERAL DYNAMICS CORPORATION

Ernest D. Perkins, Robert Charbonneau, William Carroll, Thomas Fagan, John Munton, John O'Shea, et al.

v.

General Dynamics Corporation

William Barlow

v.

General Dynamics Corporation

Thomas Teixeira

v.

General Dynamics Corporation

James Molonson

v.

General Dynamics Corporation

Nos. 3:96CV1317 (JBA), 3:98CV1181 (JBA), 3:96CV1321 (JBA), 3:96CV1325 (JBA), 3:96CV1328 (JBA).

United States District Court, D. Connecticut.

Sept. 28, 2000.

228

Thomas G. Moukawsher, Moukawsher & Walsh, Groton, CT, for Plaintiffs.

Linda L. Listrom, Craig C. Martin, Eric J. Wilson, Marc A. Van Allen, Ellen C. Meyer, Jenner & Block, Chcago, IL, Rodger W. Lehr, Jr., General Dynamics/Electric Boat, Groton, CT, for Defendant.

## MEMORANDUM OF DECISION

ARTERTON, District Judge.

## TABLE OF CONTENTS

I.   Introduction .................................................. 229

II.   Findings of Fact ............................................. 230

     A.   The Parties ............................................. 230
     B.   Labor Relations at EB .................................. 231
     C.   Development of the Golden Handshake ............... 233
     D.   MTC Contract Negotiations .......................... 236
     E.   Extending the Golden Handshake to Other Groups ...... 239
     F.   Inquiries to Benefits Counselors at EB ............... 240

III.   Conclusions of Law ......................................... 242

     A.   Fiduciary Capacity .................................... 242
     B.   Scope of Fiduciary Duties ............................ 243
     C.   Fiduciary Duties under *Ballone, Becker,* and *Mullins* ................... 247

         1)   Failure to Disclose ............................... 247
         2)   Materiality of Misrepresentations ................. 249

             a)   Principles of Serious Consideration ........... 249
             b)   Serious Consideration of Plan Changes for Various Employee Groups ................................ 252
     D.   Individual Plaintiffs ................................. 255

         1)   "Phase One" Plaintiffs ........................... 255
         2)   Representative Plaintiffs ......................... 261

IV.   Conclusion .................................................. 273

## I. INTRODUCTION

In the early 90's, people around the world rejoiced at the fall of the Berlin wall and the end of the Cold War. But to paraphrase Ernest Thayer, there was no joy in Groton, Connecticut.[1] Groton is the home of Electric Boat ("EB" or "Electric Boat"), a major defense contractor and one of only two submarine manufacturers in the country. Electric Boat employed thousands of draftsmen, laborers, engineers, and other workers, all of whom had essentially spent their working lives engaged in the Cold War. As the federal government drastically cut defense spending, EB and other defense contractors were forced to cut costs and reduce their workforces.

As part of the workforce reductions, EB offered its workers early retirement incentives, or "golden handshakes"; some employees, such as the plaintiffs, however,
retired before these incentives were announced, and were therefore unable to participate in the enhanced benefits. Plaintiffs claim that General Dynamics ("GD" or "Corporate"), the parent corporation of EB, breached its fiduciary obligations under the Employee Retirement Income Security Act (ERISA) when it failed to disclose or misrepresented factual information about the retirement incentives to potential retirees. This memorandum of decision contains the Court's findings of fact and conclusions of law based on the evidence presented at the bench trial held November 1 – November 19, 1999.

---

1.   Ernest L. Thayer, "Casey at the Bat."

## II. FINDINGS OF FACT[2]

### A. The Parties

Defendant General Dynamics Corporation is a Delaware corporation headquartered in Falls Church, Virginia. General Dynamics is a prime defense contractor for the United States ("Government") and its allies. Stipulations of Fact, ¶ 4 (Stip.). Through its divisions and subsidiaries, General Dynamics designs and builds complex marine and ground combat systems, including submarines, tanks, amphibious assault vehicles, and ships, as well as complex auxiliary military systems, including armaments, artillery, and computerized information systems and technology. General Dynamics designs and builds submarines for the Government by and through EB, its wholly-owned subsidiary and former division. Stip. ¶¶ 5, 6. At the time relevant to this opinion, Electric Boat was a division of General Dynamics.[3] Electric Boat has facilities in several states, and operates primarily in Groton, Connecticut. Electric Boat's operations in Groton, Connecticut are divided between: (1) submarine construction in the shipyard (or, "the yard"); and (2) submarine design and engineering (or, submarine "innovation") on "the hill."

Plaintiffs are eighty-nine former employees of Electric Boat who are now retired. Fifteen of the plaintiffs were, at the termination of their employment with Electric Boat, hourly employees represented by the Metal Trades Council of New London County ("MTC" and "MTC plaintiffs"). The MTC is an umbrella labor organization that operates as the collective bargaining representative for ten local trade unions; the MTC plaintiffs worked in the yard at Electric Boat's Groton, Connecticut facility, on submarine construction. Sixty-two of the plaintiffs were, at the termination of their employment with Electric Boat, salaried employees at various Electric Boat facilities ("Salaried plaintiffs"). Four of the plaintiffs were, at the termination of their employment with Electric Boat, non-union hourly employees, who worked at Electric Boat's Quonset Point, Rhode Island shipyard ("Non–Union Hourly plaintiffs"). Eight of the plaintiffs were, at the termination of their employment with Electric Boat, hourly workers represented by the Marine Draftsmen's Association ("MDA" and "MDA plaintiffs"). All plaintiffs worked at various EB facilities, including Groton, Quonset Point, Windsor Locks, and administrative facilities in Groton but removed from the main facility.

Each plaintiff was, at the termination of his or her employment with Electric Boat, a participant in a General Dynamics-sponsored pension plan pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1002(7)–(8). Each General Dynamics-sponsored pension plan is a separate benefit structure within General Dynamics Retirement Plan (Government) ("Master Plan"). Each MTC plaintiff was, at the termination of his or her employment with Electric Boat, a participant in the 1991 General Dynamics Retirement Plan for Electric Boat Division Hourly Rate Employees—Groton ("Former MTC Plan"), an employee benefit plan pursuant to ERISA, 29 U.S.C. § 1002(3). The Former MTC Plan was to expire on July 2, 1995 at midnight, simultaneously with the expiration of the 1991 collective bargaining agreement between the MTC and Electric Boat ("1991 MTC Collective Bargaining Agreement"). Each MDA plaintiff was, at the termination of his or her employment with Electric Boat, a participant in the 1993 General Dynamics Retirement Plan for Electric Boat Division Marine Draftsmen's Association UAW Hourly Rate Technical Design Employees ("Former MDA Plan") pursuant to

---

**2.** Additional factual findings are made, infra, in the context of the Court's legal discussions of plaintiffs' claims.

**3.** In approximately December 1995, Electric Boat became and presently is a wholly-owned subsidiary of General Dynamics.

ERISA, 29 U.S.C. §§ 1002(7)–(8). The Former MDA Plan is an employee benefit plan pursuant to ERISA, 29 U.S.C. § 1002(3). The Former MDA Plan was to expire on July 28, 1996 at midnight, simultaneously with the expiration of the 1993 collective bargaining agreement between the MDA and Electric Boat ("1993 MDA Collective Bargaining Agreement"). Stip. ¶¶ 26–27, 30, 59–60. Both the Former MTC Plan and the Former MDA Plan could be amended or modified only with: (a) the approval of and by the Chief Executive Officer and Chairman of the Board of Directors of General Dynamics; and (b) the agreement of Electric Boat and the union, reached through collective bargaining pursuant to the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 51 *et seq.* Stip. ¶¶ 31, 61.

Each Salaried plaintiff was, at the termination of his or her employment with Electric Boat, a participant in the former General Dynamics Retirement Plan for Salaried Employees ("Former Salaried Plan"), and each Non–Union Hourly plaintiff was, at the termination of his or her employment with Electric Boat, a participant in the former General Dynamics Retirement Plan for Electric Boat Division Hourly Rate Employees—Quonset ("Former Non–Union Hourly Plan"). Both plans were employee benefit plans pursuant to ERISA, 29 U.S.C. § 1002(3). The Former Salaried Plan could be amended so as to increase benefits only with the approval of and by the Board of Directors of GD, while the Former Non–Union Hourly Plan could be amended or modified only with the approval of and by the Chief Executive Officer and Chairman of the Board of Directors of General Dynamics. At all relevant times, General Dynamics was the sponsor and administrator of both the Former Salaried Plan and the Former Non–Union Hourly Plan pursuant to ERISA, 29 U.S.C. §§ 1002(16)(A)–(B). Stip. ¶¶ 38–56.

General Dynamics provided participants in all the above employee benefit plans with a booklet-form Summary Plan Description ("SPD") of the respective plans, in accordance with ERISA, 29 U.S.C. § 1021(a). Stip. ¶¶ 33, 43, 52, 63.

## B. Labor Relations and Economic Conditions at EB

Between 1970 and 1991, funding for the manufacture of eighty-three submarines for the United States Navy was authorized by Congress. During this time, Electric Boat's sole competition for U.S. Navy submarine construction contracts came from Newport News Shipyard in Newport News, Virginia ("Newport News"). EB was awarded fifty-three of the Navy contracts, and Newport News Shipyard was awarded the remaining twenty-nine. When bidding on these submarine contracts, EB utilized a forward pricing rate, or a "wrap rate," that incorporated the costs for direct labor, overhead, and materials, and the number of labor hours necessary to build the submarine. Testimony of Donald Norman ("Norman Test.") at 372.

Beginning in 1991, in the wake of the Cold War's end, the United States Navy dramatically reduced its planned purchases of nuclear submarines from Electric Boat, including the announced cancellation of the Seawolf Class of nuclear submarines. Stipulation of Facts, Tr. at 719. In response, Electric Boat began a process of downsizing and reorganization generally referred to as the Re–Engineering effort. *Id.* Part of the Re–Engineering effort was to reduce the number of persons employed at Electric Boat from 22,000 to 7,000 within five years. The reductions were focused on submarine production in the "yard," rather than submarine design on the "hill," as the Navy continued to award contracts for new submarine designs. *Id.* Because these workforce reductions were done according to reverse seniority under the respective union contracts, EB became concerned about maintaining "critical skills," a concern apparently based on the perception that the physical agility necessary

to work in the cramped quarters of submarines decreased with age. Norman Test. at 365.

The downsizing and re-engineering came at a time of tense labor relations at Electric Boat. In 1988, the MTC had gone on a bitter 103–day strike at Electric Boat. Norman Test. at 385. For several years following the 1988 MTC strike, communications between Electric Boat and its unionized workforce remained strained. Norman Test. at 388. In early 1989 Don Norman ("Norman") was named vice president of human resources at the company's Electric Boat Division. Part of the reason for his appointment was his success at improving labor-management relations at Land Systems, another General Dynamics division. Norman Test. at 386.

Norman was one of EB's senior managers who had supervisory responsibility for all benefits-related matters at Electric Boat. Norman reported, in part, to GD human resource officials whose primary responsibility was to approve company policy changes and make sure the company divisions followed them. Norman also had supervisory responsibility for all communications with employees at Electric Boat. Norman Test. at 355. EB utilized a variety of written publications to communicate with the EB employees, including a publication entitled "EB News," a newsletter aimed at the entire workforce. Testimony of Neil Ruenzel ("Ruenzel Test.") at 1802–05. The "JPPC Update"was another means of communication aimed at the "delivery" workforce, meaning those who worked in the shipyard, and the "MDA News" sought to reach the unionized engineers and designers. Testimony of Melvin Olsson ("Olsson Test.") at 954. All of these newsletters were published on a periodic basis, while the "EB Bulletin" was distributed only on an ad hoc basis for key announcements. Norman Test. at 101, Ruenzel Test. at 1808. Norman testified that he believed that these publications were left in boxes by gates and time clocks for employees to pick up, but he was not aware of any formal distribution channels. Norman Test. at 820.

According to Norman, union-related pension changes would be initiated at both the division and the corporate level, but could be approved only by GD corporate. Norman Test. at 66–67. In order to receive approval for a golden handshake offer at GD, the idea would be studied and approved at the division level, and then forwarded to corporate for approval. *Id.* The same general structure applied to collective bargaining negotiations. Whereas in previous negotiations a corporate labor-relations representative from GD would come to Groton to negotiate the contract, done in classic tough management style, at all times relevant to this dispute, EB was given limited authority to negotiate and reach agreement with the union, within the prescribed economic parameters set by GD. EB negotiators, such as Norman, attended "Economic Parameters" meetings at corporate headquarters, during which corporate finance and HR officials would discuss the economic limits within which EB negotiators could operate and would authorize particular packages or wage structures. These economic issues, which included changes to the EB pension plan, could only be approved through this procedure, as neither Don Norman nor James Turner, then the Chief Executive Officer of EB, had the authority to revise the plan or reach agreement on issues such as wages. Norman Test. at 724–25.

Under its re-engineering program, Electric Boat began laying off unionized manufacturing employees in 1991, which presumably did nothing to assuage the existing labor-management tension at EB. In mid–1991, Norman was transferred to GD's corporate office, but was transferred back to the Vice–President position at the EB division during the second quarter of 1993 as a result of a corporate reorganization. Norman Test. at 63. Upon his return to EB, Norman initiated talks with the MTC leadership that resulted in the formation of a joint committee—the Joint

Planning Process Committee ("JPPC"). The purpose of the JPPC was to re-establish productive communications between Electric Boat management and the MTC and to discuss and address the new economic realities at Electric Boat, including the need for substantial workforce reductions in the yard. According to Norman, the committee operated on a consensus basis, and only communications authorized by the entire committee were to be released to the general EB population, via the JPPC Communications subcommittee. Norman Test. at 400–414. This subcommittee communicated with the Electric Boat workforce by means of a newsletter, the "JPPC Update," which was distributed in boxes at the gates and plant exits. Testimony of Joe Quatrimoni ("Quatrimoni Test.") at 816.

The JPPC had no official decision-making authority, nor was it able to discuss "negotiable" issues such as wages. The evidence demonstrates, however, that EB was very concerned with improving its relations with the MTC, and sought the union's involvement in its efforts to reduce costs while maintaining "critical skills." The amount of resources expended on the institution and perpetuation of the JPPC indicate that EB viewed this committee as an important adjunct to EB's decision-making process as a precursor to negotiations, while not formally recognized as such.

## C. Development of Golden Handshake

According to Norman, he began considering the possibility of offering retirement incentives, or "golden handshakes," to EB employees in 1994. Norman Test. at 102. Historically, GD had never offered such retirement incentives, but on February 21, 1994 the Land Systems Division Norman had previously supervised offered a Golden Handshake to its employees. P.Ex. 11.

Interest in golden handshakes for EB employees first arose at the initial JPPC meeting on December 20–21, 1993, where it was listed on a "tally" of the various

issues the JPPC would address. P.Ex. 78. The president of the MTC, Kenneth Dela-Cruz, testified that the MTC leadership used the JPPC as a forum to indicate its interest obtaining retirement incentives as part of its next collective bargaining agreement to be negotiated in 1995. DelaCruz Test. at 838–39. Norman was a member of the JPPC, along with representatives of each MTC union and other management personnel. Norman Test. at 86. In early April 1994, Norman saw reports in area newspapers that, in the midst of enormous layoffs, EB president James E. Turner, would receive an annual compensation package worth approximately $7 million. P.Ex. 13. In response to the publicity, at an April meeting angry members of the JPPC confronted Norman with this information and demanded the creation of financial incentives which reached workers as well as top management. P.Ex. 14 at 009230. They discussed profit sharing, and the need to "share the wealth." *Id.* In response to this criticism, in the April 8, 1994 "JPPC Update" Norman confirmed that he "has been looking at the possibility of [profit sharing and] golden handshakes for the entire Electric Boat workforce...." Jt.Ex. 23. In his trial testimony, Norman confirmed this was an accurate statement of fact at the time it was made, in that he was considering many different possibilities, including golden handshakes, profit-sharing, and "team rewards" plans, to reduce costs and accomplish the necessary downsizing. Norman Test. at 103.

Before the end of April 1994, the possibility of a golden handshake was included on a list of "discussible" items to be considered as part of the JPPC process, P.Ex. 17, even though issues such as the wage structure at EB or manpower concerns could not be resolved by the JPPC, as they were subject to the collective bargaining process. Delacruz Test. at 838; Norman Test. at 416. Minutes from the April 27, 1994 meeting indicate that the committee's delineation of the issues that were appro-

priate for JPPC discussion resulted in placement of golden handshakes on the "discussible" side. Def.Ex. 24. From June 20–22, 1994, the JPPC held a two-day off-site working meeting, "Interlaken." P.Ex. 16; P.Ex. 94 at 009122. A document entitled "Issues," produced for the Interlaken meeting, lists golden handshakes, along with three other issues that were to be addressed at this meeting. P.Ex. 94. Further documents produced from this meeting show that golden handshakes were to be discussed in a variety of contexts, including the retention of critical skills and implementing the down-sizing effort. *Id.* A document produced after the first session of the Interlaken meeting, entitled "What Do You Want Out of the Two Days?", indicates that some participants sought an announcement to employees that the JPPC is "seriously" talking about a golden handshake. P.Ex. 95 at 009140. While the seriousness with which the JPPC addressed the golden handshake issue at Interlaken is not clear, on June 28, 1994, the JPPC established a specific "Golden Handshake Subcommittee" to explore the possibility further. Def.Ex. 26; Norman Test. at 432. The Golden Handshake Subcommittee ("GH Subcommittee") was co-chaired by Electric Boat employees Robert DiNapoli, EB's Manager of Non–Nuclear Operations, and Joe Quattromani, the MTC secretary-treasurer. Norman was also a member. P.Ex. 24.

The July 1, 1994 edition of "EB News" published an interview with Norman, in which he stated that the company was "looking at this issue [the golden handshake].... We are looking at it seriously now ... We are looking at one that we could implement across the board. My sense is that we'll come up with something, but it will not be this year because of our workload. If we do anything, it'll probably happen in 1995." Jt.Ex. 17.

Beginning on July 14, 1994, the Golden Handshake Subcommittee met on a monthly basis for the remainder of the year. P.Exs. 24, 33, 42. According to

meeting minutes, subcommittee members studied numerous specific golden handshake proposals available at other companies, including Pfizer and Land Systems. P.Exs. 25, 29. The subcommittee also reviewed a matrix of 38 different company golden handshakes, prepared by Marie Pardo from the Employee Benefits office and Co–Chair Quattrimoni. P.Ex. 46. The minutes of the August 11, 1994 meeting reflect that Norman cautioned the golden handshake subcommittee members "not to give false hopes ... when people ask you about should they retire or not. Your answer should be that we are studying the different scenarios of the [g]old[en] [h]andshake in different places and when it will happen or not happen, we do not know." P.Ex. 33. While the proceedings of the Golden Handshake Subcommittee were kept confidential, the *possibility* of a golden handshake was not kept secret from the EB workforce, as Joe Quattrimoni testified that he told inquiring MTC members that a golden handshake was under discussion, but that nothing was decided. Quattrimani Test. at 872.

At the August 25, 1994 meeting of the Golden Handshake Subcommittee, Daniel S. Hapke, Jr., Division Vice President and General Counsel, delivered a detailed slide presentation on "Issues to Consider in Designing a Retirement Incentive Window (RIW)." The presentation addressed several questions, such as sources of funding and potential legal issues, including fiduciary obligations. P.Ex. 42. The minutes indicate that the attendees discussed possible target populations for a golden handshake, as it could be "aim[ed] at BU (bargaining unit) employees, NBU (non-bargaining unit), or both." P.Ex. 42. In addition, one of the slides prepared for this presentation lists the potential offerees for such a golden handshake: "Members of the Bargaining Units ... Salaried ... or Both." P.Ex. 42. According to the minutes, Marie Pardo from the benefits office was also present at the meeting, and informed the JPPC members that she

was "integrating data" for the matrix she was preparing. P.Ex. 42.

The September 15, 1994 meeting minutes of the Golden Handshake Subcommittee indicate that Marie Pardo was also in attendance at that meeting, and that a letter had been received from an employee asking whether EB would offer early retirement incentives to its workforce. P.Ex. 46. Based on the minutes, the Court infers that a discussion of how to respond to employee inquiries occurred, and Pardo apparently provided some information from an early retirement incentive offered in 1991, presumably at another company. An excerpt of this information, as recorded in the minutes, provides a good snapshot of the participants' state of mind on the issue:

> Decisions are made at the highest level of management and cannot be disclosed in advance. It is not possible to know whether the Company will or will not offer in the future any other early retirement or exit incentive programs and, therefore, no manager is in a position to advise any employee whether or not to participate in the [early retirement plan] or to speculate about future exit incentive programs. Unless and until any special offers are formally announced by the Company, no one is authorized by the Company to give assurance that a special offer will or will not occur.

*Id.* The attendees apparently took this advice to heart, and authorized a letter responding to the inquiring employee, in which "nothing about consideration or having a Golden Handshake plan should be mentioned." *Id.*

The GH Subcommittee continued to meet, and review additional plans from other companies, and by October 1994 had also reviewed charts showing company costs broken down by age for the entire workforce, as well as manning projections and age data concerning the Electric Boat workforce as a whole and the MTC workforce in particular. P.Exs. 86, 88, 93. At that October 14, 1994 meeting, Marie Pardo of the Employee Benefits office presented a paper entitled "Focus on Early Retirement" which discussed golden handshake options. P.Ex. 51.

In its final two months of operation, the GH Subcommittee broke into two smaller sub-subcommittees; one to address "should we have a golden handshake," P.Ex. 53 at GD008983, and one to address the structural elements of such an offer. P.Ex. 51. Both of the sub-subcommittees were informed that their final reports to the JPPC were expected in December. P.Ex. 51. On November 9, 1994 the Golden Handshake "Structural" Sub-subcommittee met. It discussed the structure, funding, and scope of a possible golden handshake, reaching resolutions which were ultimately reflected in the final version of the golden handshake offer: (a) the golden handshake should be targeted at those over fifty-five; (b) it should be offered to all departments; (c) it should be funded out of the pension fund; and (d) it should address extended medical benefits. P.Ex. 54. Also in November 1994, Human Resources prepared a demographic survey of the entire Electric Boat workforce for use by the Critical Skills Committee, another JPPC subcommittee. This data charted MTC employees by age and years of service, and was shared with the GH Subcomittee. P.Ex. 50. A November 10, 1994 JPPC Update confirms that the Golden Handshake Subcommittee was to finish business by "the Christmas shutdown," Jt. Ex. 28. As of the final JPPC meeting on December 2, 1994, the Golden Handshake Committee and the JPPC tabled the matter because MTC contract negotiations were commencing, and the committee considered that it had gone as far as its mandate allowed in pursuing the issue. Jt.Ex. 29; Quattrimani Test. at 909; Norman Test. at 605. Norman testified that to his recollection, the Golden Handshake Subcommittee of the JPPC never reconvened. Norman Test. at 440.

Neither the Golden Handshake Subcommittee nor the JPPC ever received any

financial or actuarial data regarding the cost to EB of any early retirement incentives. The JPPC and the GH Subcommittee never made any formal recommendations to EB management as to the need or structure of any retirement incentive because such programs are negotiable issues subject to the process of collective bargaining and "Economic Parameters" meetings discussed above. Nonetheless, although the JPPC and its constituent subcommittees issued no final report or concrete proposal, it is clear from the evidence presented at trial that the EB management considered the JPPC an important part of its decision-making process, both in developing the proposal that was ultimately adopted and, on a more abstract level, in demonstrating to the workforce that EB was truly committed to improving its labor relations and changing the culture at EB as the re-engineering effort continued. It is undisputed that the required order of MTC layoffs would have a negative impact on the critical skills of the workforce in the "yard." Therefore an early retirement incentive was conceptualized as providing two benefits to Electric Boat: it served as a bargaining item in negotiations for EB to use to trade off against other costs for the unionized workforce, and it helped achieve the goal of reducing the number of employees in the yard without recourse to layoffs based on inverse seniority. Therefore, while there is no evidence that during the JPPC process EB management promised or expressly indicated it would seek approval from General Dynamics to offer a retirement incentive to the MTC workforce, the idea clearly had momentum, and was moved into the MTC collective bargaining framework which commenced in January of 1995.

### D. MTC Contract Negotiations

With MTC employees' union contract expiring in July, 1995, contract negotiations between Electric Boat and the MTC commenced on January 23, 1995. Def.Ex. 33. In the negotiations that led to the 1988 strike, both the union and EB management communicated with the EB workforce separately, each with its own "spin." This polarized communication had exacerbated the tensions surrounding the negotiations, according to Tom Kiddy, who was the chief negotiator for EB in the 1995 MTC contract talks. Thus, to further reduce the strain on the relationship between the two during the 1995 negotiations, both the union and EB agreed that the substance of the 1995 bargaining would remain confidential until the negotiations were completed, and that any specific information would be released only through joint EB-MTC communications. Kiddy Test. at 940. The MTC and EB also agreed to resolve non-economic issues before beginning bargaining on economic issues, such as wages and retirement incentives.

As noted above, while division-level management officials at EB actually participated in the process of collective bargaining at EB, they needed the authorization of GD corporate officials to make or accept offers on certain economic issues. Norman testified that as of late 1994–early 1995, while he viewed the golden handshake as a good way to reduce numbers and still retain critical skills in the EB workforce, he was concerned about corporate's receptivity to the proposal. Norman Test. at 454. On February 23 1995, Rhonda Migdail ("Migdail"), General Dynamics Corporate Vice–President of Benefits, met with Norman and other EB management officials at EB to discuss the MTC negotiations, and prepare for upcoming meetings with GD corporate officials on the economic parameters for final negotiations. Norman Test. at 484; P.Ex. 63 (under seal). David P. McLean, a representative of W. Alfred Hayes & Co., General Dynamics' long-standing actuary for pension-related calculations, attended this meeting as well. Norman Test. at 532. The EB management officials in attendance told the corporate representatives that some sort of retirement incentive had been identified as a high union priority for the upcoming eco-

nomic negotiations. P.Ex. 63 (under seal). EB management did not know if there were sufficient assets in the General Dynamics Master Plan to fund such an incentive. Migdail and EB management asked McLean to calculate the liabilities to the Master Plan for various forms of retirement incentives for the MTC, and these data were provided March 8, 1995. Jt.Ex. 361 (under seal). One of these options was deemed a "55/10" retirement incentive, or one available to employees who were at least fifty-five years of age and had at least ten years of continuous service. *Id.*; Norman Test. at 486–87. Other options were also costed out, including a "55/80" retirement incentive, available to MTC members who were at least fifty-five years of age and whose age plus years of service equaled eighty or greater, and a "55/85" retirement incentive, available to MTC members whose were at least fifty-five years of age and whose age plus years of continuous service equaled eighty-five or greater. *Id.* The actuary also costed out the costs of providing one year free medical coverage to retirees, plus the cost savings that would result by eliminating certain retiree medical benefits, a company objective. *Id.*; Norman Test. at 497.

Starting in mid-April, members of EB management including Norman, Turner, and Thomas Brown, EB's Vice–President of Finance and Operating Systems, met several times and discussed the various options for retirement incentives, in preparation for the economic parameters meetings to be held at General Dynamics headquarters. Norman Test. at 533. In these discussions they debated the pros and cons of offering retirement incentives, but as Norman testified, "by the time we got to corporate, we were pretty much on the same page." Norman Test. at 534. Norman, Turner, and Brown agreed to recommend at the economic parameters meeting that EB offer an in-plan early retirement incentive to the MTC during contract negotiations.

On May 2, 1995, a "preliminary" economic parameters meeting for the MTC negotiations was held at General Dynamics corporate headquarters in Falls Church, Virginia. Mancuso Test. at 734; Norman Test. at 497; Testimony of Thomas Brown ("Brown Test.") at 671. Attendees at this meeting included Donald Norman; Thomas Brown, EB's Vice President—Finance; Terry Chambers, EB's Manager–Finance; and Tom Kiddy, Director of Employee Relations, Staffing and Placement for Electric Boat. The corporate representative included Rhonda Migdail, General Dynamics Corporate Vice–President of Benefits; Ralph Kiger, Vice President of Human Resources and Administration; and Michael Mancuso, General Dynamics' Chief Financial Officer. Mancuso Test. at 727; Norman Test. at 492. Norman presented the MTC economic parameters proposal, including the early retirement incentive, as a sort of "dry run" with the human resources and benefits people at corporate "to make sure they were in concert" with the EB management. Norman Test. at 492. The package Norman prepared for this meeting indicates that Norman viewed retirement incentives as both a company objective and a union goal. Def.Ex. 368 (under seal). The presentation included the 55/10 retirement incentive, as well as the elimination of the retiree Medicare Supplement coverage. *Id.* The presentation also showed that Newport News had implemented its early retirement incentive, at approximately the same cost as EB's proposed program. *Id.*

Corporate apparently greeted Norman's proposal with some skepticism, as they were concerned about the costs and the justification for the program. Norman Test. at 511. Mancuso testified that he had concerns about the financial incentives, including whether the costs would be "allowable" in EB's government contracts, and whether the plan would result in the pension fund liabilities exceeding its assets. Mancuso Test. at 733–734. Mancuso asked EB management for more information on the impact the incentive program

would have on various areas of corporate finance. Mancuso Test. at 735.

The first regular MTC economic parameters meeting was held on May 8, 1995 at General Dynamics corporate headquarters. In addition to the attendees at the preliminary May 2 meeting, EB's CEO James Turner, General Dynamics President James Mellor and Vice President Nick Chabraja also attended. Mancuso Test. at 734. Norman had revised the early retirement incentive presentation to reflect the company's objectives on retiree medical care benefits, and also noted top union objectives, including achievement of the golden handshake. Def.Ex. 452 (under seal). EB management also presented the 55/85 early retirement incentive proposal instead of the 55/10 proposal, which Migdail had deemed "too rich." Norman Test. at 511. Mancuso testified that he was still not convinced of the soundness of EB's proposal at this time, as he remained concerned about the impact of such a proposal on General Dynamic's financial condition. He asked EB management to collect more data, and in particular to cost-out the liability to General Dynamics if such a retirement incentive was offered to *all* EB employees, including salaried and non-union hourly employees, because he "was concerned that, of course, that the impact of a program offered to the MTC may at some point in time also wind up being offered to other elements of the population and/or other business units within General Dynamics...." Mancuso Test. at 737. Norman testified that he had not prepared such calculations because he was focused on the MTC negotiations and had not considered other employee groups. Norman Test. at 517.

GD corporate officials were also concerned about the different funding mechanisms for a retirement incentive, particularly whether to fund them "in-plan," meaning with the pension fund assets, or "out of plan," meaning with General Dynamics' assets. An out-of-plan retirement incentive would have an immediate impact on General Dynamics' earnings, and would increase the bidding rate for government contracts in that particular year. The impact of an in-plan retirement incentive, in contrast, would be spread out over several accounting periods, and would be dependent on the funding status of that plan: if the plan were in a surplus position, the surplus could be used to absorb the increased costs without requiring additional contributions by the employer. Mancuso Test. at 742.

In accordance with corporate's instructions at the May 8 meeting, McLean the actuary performed additional calculations to estimate the cost of extending the golden handshake to other employee groups at EB. Mancuso Test. at 737. His first estimates utilized the 55/85 plan to calculate the costs for the non-union employees, the salaried employees, and the technical design employees (the MDA group). On May 23, McLean modified his earlier calculations and estimated the liabilities for a 55/10 retirement incentive for all employee groups at EB. Def.Ex. 376 (under seal). Norman and the EB management presented these numbers at the second economic parameters meeting on June 1, 1995.

In the interim, after the first economic parameters meeting on May 8, 1995, Mancuso and the corporate finance department conducted additional studies of the early retirement incentive, including a current analysis of the pension plan assets. Mancuso Test. at 738. Although an exact date is not clear from the record, at some point between the May 8 meeting and the second economic parameters meeting on June 1, 1995, Mancuso learned that the General Dynamics pension plan was overfunded; that is, its assets exceeded its liabilities such that General Dynamics did not need to make pension contributions, and the additional costs of the MTC retirement incentive would still not take the plan out of a surplus position. Mancuso Test. at 755. Mancuso testified that this discovery made the decision to approve the retirement incentives easier, as "there would be

no immediate impact for the foreseeable future on estimated cost, bid rates, [and] the competitive posture of Electric Boat." *Id.*

Prior to the second economic parameters meeting on June 1, 1995, Norman met with Migdail and Kiger at EB at some point towards the end of May. He informed them that he was very concerned about receiving approval for the golden handshake, because he saw it as a potential strike issue with the union, and that he "really need[ed] to have the 55 and 10 option." Norman Test. at 519.

At the second economic parameters meeting on June 1, 1995 Norman again presented the 55/10 retirement incentive plan. The only difference between the figures presented by Norman at the May 8 meeting and the June 1 meeting is the varying eligibility levels for the golden handshake, although the cost estimates for the 55/10 plan varied slightly from the May 1, 1995 preliminary economic parameters meeting. Norman Test. at 522. The financial data he presented included liability estimates for all employee groups, and the cost savings that would result from certain benefit cuts. Def.Ex. 223 (under seal). At the June 1, 1995 meeting, no doubt aided by the knowledge of the Plan's surplus funding situation, Norman convinced General Dynamics about the importance of the golden handshake, and that it would allow him to maintain critical skills and improve relations with the union while still reducing the workforce. Norman received approval to offer the 55/10 option to the MTC, but he did not request approval to extend the same offer to the salaried, non-hourly and MDA employees. EB made a golden handshake offer to the MTC at the bargaining table, and at midnight on July 2 the union and the company agreed on a contract providing for the 55/10 retirement incentive with two years of company-paid medical coverage, and the elimination of retiree supplemental medical benefits. Def.Ex. 348; Norman Test. at 270. Five days later on July 7, 1995, union

members ratified the contract by a nine-to-one margin. Norman Test. at 274.

**E. Extending the Golden Handshake to Salaried, Non–Union and the Technical Design Employees.**

While there was no evidence regarding direct historical linkages between benefits received by the MTC and the benefits offered to other employee groups, the JPPC discussions regarding golden handshakes did seem to have a ripple effect at EB, as numerous people believed that benefits received by the MTC might "flow down" to the other employee groups. Testimony of Plaintiff Raymond Hudson ("Hudson Test.") at 1572. The MDA-represented engineering employees also heard of the golden handshake discussions, and in December 8, 1994, Robert Nardone, Electric Boat's Director of Compensation was interviewed by the MDA/Engineering News. Nardone, who was later named Norman's successor as Vice–President of Human Resources, declared in that interview that:

> The Division is continuing to look into the feasibility of [golden handshake] programs. A great deal of information has been, and is being, collected regarding other companies' efforts, our employee population demographics, future manpower requirements, federal regulation impacts and government contract clauses.

P.Ex. 58 at 008210. At trial, Norman equivocated as to whether this statement actually applied to all EB employees, but he conceded that as of December 1994, "the division was continuing to look into the feasibility of golden handshake programs for all Electric Boat employees." Norman Test. at 193,

Within days after the MTC ratified the contract containing the 55/10 golden handshake, Norman presented the idea of extending the golden handshake "to the rest of the population at EB" to his division's management. Norman Test. at 544; Jt. Ex. 379 (under seal). The financial analy-

sis Norman performed demonstrated that by offering the retirement incentives to the salaried population EB could reduce the "average" rate, or the labor-hour on which its federal contract rate was calculated, because the higher-paid, more senior employees would take the golden handshake offer, thus reducing the average labor-hour rate for EB as a whole. Norman Test. at 550. With the concurrence of Turner and Brown, Norman presented his proposal to Migdail and Kiger on the 5th or 6th of July. Norman Test. at 554. Without any additional analyses on Norman's part, he received approval to extend the same golden handshake offer the MTC had received to the salaried and nonunion employees approximately a week later. The Court infers from this close timetable, and the fact that no additional meetings or analyses were required by GD before approval, that due to the state of labor relations between GD and the MTC, the company was simply waiting for MTC ratification before it extended the golden handshake to other employee groups, but that such an extension was not the subject of serious debate.

The MDA, representing technical design employees, was in a different position than the MTC, whose members were primarily employed in the "delivery" department, or "the yard." At that time, technical design employees were being added to the company's payroll, due to EB's shift to new submarine design, and away from production. Norman Test. at 374; Olsson Test. at 354–55. When the MDA contract negotiations began in May of 1996, MDA President Melvin Olsson believed that extending the golden handshake to the MDA would only be fair, given that every other employee group had received it. He was not, however, certain about the union's chances of achieving it, given the very different position of the MDA's members at EB. Olsson Test. at 956. The MDA was offered the golden handshake in July of 1996. Def.Ex. 397 (under seal).

## F. Inquiries to Benefits Counselors at EB

The witnesses at trial, including defendant's Vice–President of Human Resources Don Norman, all agreed that the Employee Benefits office was the best source for benefits-related information. All plaintiffs testified that they had never been directed to get benefits information from company newsletters such as the EB News or the JPPC Update, and many witnesses had not heard of or did not read such publications. Instead, nearly every plaintiff sought information from benefits counselors at EB. The Benefits Office at the main Groton facility was supervised by Marie Pardo, a human resources employee, who reported to John Hardink, Chief of Employee Benefits for EB. Pardo supervised three benefits counselors, Sara Guido, Theresa Materas, and Charlene Hunter. The other EB locations apparently had some human resources employees as well, including Diane Porter at Quonset Point and Vicki Brown at Windsor Locks, but the testimony demonstrated that employees viewed Marie Pardo in Groton as the most informed and best source of information, because employees at locations removed from the Groton facility were directed to speak with her when they asked particular questions about retirement incentives.

Pardo testified that her duties were to present benefits and options to EB employees, and answer questions accurately and completely, to the best of her abilities. She did view her role as that of an employee advocate, and if she knew that "something definitely existed that would improve [employees'] benefits," she had a duty to inform them. Pardo Test. at 1680. Her primary function, however, was to communicate the benefits and options that existed at the time the employee retired, unless she had been specifically instructed to pass along more information. The other benefits counselors took their directions from Marie Pardo, and would relay the information she gave to them.

Pardo acted as a "resource" to the Golden Handshake Subcommittee, and in that capacity she attended several meetings to make presentations about the "matrix" she was compiling of other companies' retirement offers. Pardo Test. at 1667. Pardo was present at the September 15, 1994 subcommittee meeting where the subject of how to respond to employee inquiries arose. According to Pardo, she understood the answer to MTC members to be "we may or may not have a golden handshake; it is subject to negotiations," and she instructed the clerks and benefits counselors in her office to answer questions accordingly. *Id.* She remembered many inquiries in the 1994 and 1995 time period, as the golden handshake discussions with the MTC were "no secret," and characterized the questions as people wanting definite answers about whether there would be a golden handshake or not. Her standard response, according to Pardo, was that she did not know if there was going to be one, that it was subject to negotiations, and that EB "may or may not" offer retirement incentives. Pardo Test. at 1689–90. She testified that she informed MTC members inquiring after negotiations began that any retirement incentives were subject to negotiations, and that it was "standard practice" to inform union members that benefits might improve after negotiations. *Id.* at 1742. In response to salaried employees' questions, according to Pardo, she informed them that a golden handshake might or might not be implemented, but that in her own personal view, it would not happen before the MTC achieved such a plan in negotiations. Pardo Test. at 1669. Pardo did not learn that EB management was considering extending the golden handshake to salaried employees until July 12, 1995.

Pardo testified that she changed her standard responses as the factual circumstances changed: she gave one response prior to negotiations, and another once they began. Her testimony on this point was equivocal and vague, however, and the substance of her "standard response" var-

ied. Her lack of perfect recollection is understandable, as many employees were being laid off or retiring and her office was performing on average twenty counseling sessions a day. But her testimony about her "standard response," and how she instructed the benefits counselors to answer questions, is simply not credible. At least twenty plaintiffs testified that, contrary to Pardo's version, the predominant response was some variation of "I don't know" or "it's a rumor." No employee indicated that Pardo told him or her that the golden handshakes were subject to negotiations, or were under discussion. The Court finds that the plaintiffs' recollection should be credited, because they are more likely to recall clearly the specifics of the individual discussions with her precisely, as the information imparted was of great importance to each plaintiff personally. Pardo engaged in many such conversations, and obviously cannot be expected to remember what she said on each occasion. The Court therefore credits plaintiffs' testimony over Pardo's, with respect to the substance of the information imparted by Pardo to inquiring employees, to the extent it reflects that Pardo did not convey what she testified she conveyed to these plaintiffs.

Ms. Lee Vincent was another employee of the benefits office, whose job duties apparently consisted of "checking out" retiring employees on the last day and helping them select their retirement gift. Testimony of Lenia Vincent ("Vincent Test.") at 1751. Several plaintiffs testified that they asked Ms. Vincent for any last-minute golden handshake information on their last day, but Ms. Vincent did not recall any such inquiries. Ms. Vincent's trial testimony, however, demonstrated to the Court that she was focused solely on her job, and any inquiries on extraneous matters, such as questions about golden handshakes, may not have penetrated sufficiently for her to recall them years later. Therefore, the fact that Ms. Vincent has no recollection of the various inquiries does not dis-

credit the plaintiffs' testimony that they made them.

## III. CONCLUSIONS OF LAW

### A. General Dynamics was acting in its capacity as a Plan Administrator, not a Settlor, when it conveyed information regarding retirement options to beneficiaries, and therefore, ERISA fiduciary duties attach to these communications.

As a threshold matter, General Dynamics contends that its consideration of future retirement incentives is not subject to any duty under ERISA. Defendant cites cases such as *Hughes Aircraft v. Jacobson*, 525 U.S. 432, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999) and *Lockheed Corp. v. Spink*, 517 U.S. 882, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996), in support of its claim that it was acting as a settlor when it considered amendments to the General Dynamics pension plan. Defendant is correct in its general statement of the law, that amending an ERISA plan is not a fiduciary act that triggers fiduciary duties. Both *Jacobson* and *Spink* involved changes to employer-sponsored retirement plans; in *Spink*, beneficiaries challenged a provision that conditioned the receipt of early retirement benefits on the participant's release of employment-related claims, and in *Jacobson*, employees argued that the addition of a noncontributory benefit structure to the pension plan violated ERISA. In both cases the Supreme Court concluded that ERISA's fiduciary duties are not implicated where the employer, acting as the plan's settlor, makes a decision regarding the form or structure of the plan such as who is entitled to receive plan benefits and in what amounts, or how such benefits are calculated. *See Jacobson*, 119 S.Ct. at 763. As noted in *Jacobson*, the beneficiaries' fiduciary duty claims were foreclosed by *Spinks'* holding "that, without exception, '[p]lan sponsors who alter the terms of a plan do not fall into the category of fiduciaries.'" *Id.* (*quoting Spink*, 517 U.S. at 890, 116 S.Ct. 1783).

Plaintiffs here, however, do not challenge the substantive *decision* to amend the plan to provide for early retirement incentives. Rather, they claim that in communicating with beneficiaries about their retirement options and benefits, General Dynamics breached its fiduciary duty by failing to disclose the likelihood of such changes. The Court concludes that such a claim is more akin to that raised in *Varity Corp. v. Howe*, 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). In that case, the Supreme Court looked to the common law of trusts in reaching the conclusion that "[c]onveying information about the likely future of plan benefits, thereby permitting beneficiaries to make an informed choice about continued participation, would seem to be an exercise of a power "appropriate" to carrying out an important plan purpose. *Id.* at 502, 116 S.Ct. 1065. Thus, while the consideration of plan changes and the decision itself may not be subject to fiduciary duties, communicating to employees about those potential changes is a discretionary act of plan management and administration that falls within the statutory definition of "fiduciary" acts. *Id.* This principle has been recognized in the earliest cases imposing fiduciary duties in the context of communicating about possible benefit changes. *See, e.g., Berlin v. Michigan Bell Telephone*, 858 F.2d 1154 (6th Cir.1988) (while decision to offer enhanced benefits was nonfiduciary business decision, communications and representations prior to decision were impressed with fiduciary obligations).

The *Varity* Court found further support for its conclusion that the employer was acting in a fiduciary capacity when it deliberately misled participants regarding the security of future benefits in the fact that the communications at issue "came from those within the firm who had authority to communicate as fiduciaries with plan beneficiaries." *Id.* at 503, 116 S.Ct. 1065. Similarly, here the plaintiffs assert that representatives of the Benefits Office, ac-

knowledged by even General Dynamics' witnesses to be the best source of benefits-related information, made material misrepresentations regarding future retirement incentives.

As this is a case challenging the information provided about plan changes, rather than the plan changes themselves, *Varity* provides the correct guiding principles. Accordingly, General Dynamics was acting as a plan administrator, not a settlor, when its agents and officers communicated with beneficiaries about potential retirement incentives, and its fiduciary duty under ERISA is therefore implicated.

### B. General Dynamic's fiduciary duty is not limited to merely a duty not to make affirmative misrepresentations in response to specific inquiries.

■ Having found that a fiduciary duty exists, the Court must determine the scope of that duty as applied to the evidence adduced at trial. Defendant advances two arguments to support its position that even if fiduciary duties attach to communications regarding future plan changes, they do not extend to the statements made in this case. First, defendant contends that it is entitled to judgment as to the claims of the Phase I plaintiffs because they did not make specific inquiries into future plan changes as required by *Pocchia v. NYNEX Corp.*, 81 F.3d 275 (2d Cir.1996). Second, defendant urges this Court to adopt a rule that absent deliberate deception, liability for misrepresentation about future plan changes cannot attach prior to "serious consideration," as determined under the three-part *Fischer II* test. *Fischer v. Philadelphia Elec. Co.*, 96 F.3d 1533 (3d Cir.1996). As there are no allegations of intentional or deliberate deceit in this case, the argument continues, judgment must enter on behalf of defendant as to all plaintiffs who retired prior to that point. The Court will take the arguments in turn.

The Second Circuit in *Pocchia v. NYNEX* held that a plan fiduciary has no duty to *volunteer* information regarding plan changes prior to adoption of those changes. In that case, the plaintiff, an attorney by training although not employed in any legal capacity at NYNEX, had terminated employment pursuant to a negotiated severance agreement. Seven months later, the retirement plan was amended to include early retirement incentives, and Mr. Pocchia brought suit claiming that he was entitled to participate. The plaintiff acknowledged that he had not inquired about future plan changes, and explicitly conceded that he had not been seeking such information because he had long since concluded, based upon rumor, that no such package would be offered by NYNEX. *Id.* at 279. Further, the plaintiff, proceeding *pro se* before both the district court and the Circuit Court, presented no evidence that the plan changes were under consideration prior to the time he retired. *Id.* at 279–280. On these facts, the Second Circuit adopted a self-described "bright line" rule and held that "a fiduciary is not required to voluntarily disclose changes in a benefit plan before they are adopted." *Id.* at 278.

Defendant argues, based on *Pocchia,* that beneficiaries must make specific inquiries, using specific terms and words, in order to trigger any duty on the part of the employer to disclose potential plan changes prior to plan adoption. The Court, however, does not cull such a requirement from the language of that case. The holding in *Pocchia* seems rather straightforward, in the Court's view: if no plan change has been decided upon at the time of the beneficiaries' retirement, and if the beneficiary is not seeking information regarding future plan changes, then an employer has no duty to attempt to offer it. Limiting an employer's fiduciary duty in such a way is logical, given the Second Circuit's observation in *Mullins v. Pfizer* that "we do not require an ERISA fiduciary to be perfectly prescient as to all future changes in employee benefits. Nor do we require a fiduciary to disclose its internal

deliberations." 23 F.3d at 669. By refusing to impose a duty to volunteer such information, the court was protecting beneficiaries from the confusion that presumably would result from a contrary rule requiring continuing and vague disclosures about the status of potential plan changes. *Pocchia*, 81 F.3d at 278. At the same time, the court was giving plan fiduciaries a certain degree of predictability regarding when a plan must disclose future changes to all employees, and safeguarding management's ability to achieve legitimate business goals, such as workforce reductions through retirement plan "sweeteners," if goals for such reductions are not met through voluntary terminations or existing retirement incentives. *Id.*

The facts in this case do not present a situation addressed by *Pocchia*. None of the plaintiffs here have conceded that they had made up their minds that retirement incentives would not offered, and thus were not seeking such information when they met with retirement counselors. To the contrary, many plaintiffs testified to their awareness of rumors regarding possible retirement enhancements, and some plaintiffs claim that they were attempting to obtain all relevant information that would aid them in maximizing their benefits and making the decision about whether or when to retire. Therefore, on a spectrum of inquiry, these plaintiffs lie beyond the "no-inquiry" point of *Pocchia*-type employees. Given that *Pocchia* lays out no principles for determining how specific a beneficiary's inquiry must be in order to trigger an employer's pre-adoption duty to disclose, and in consideration of the broad trust responsibilities owed by a plan administrator to a beneficiary, *see Varity*, 516 U.S. at 497, 116 S.Ct. 1065, this Court declines to extend *Pocchia* to cover plaintiffs who were seeking information relevant to the timing of their retirement decision, albeit with less than clarion specificity, which commonsensically includes possible early retirement enhancements.

The Court agrees with plaintiffs that to adopt defendant's formulation would result in an anomalous situation whereby a fiduciary could betray beneficiaries with impunity simply because of the latter's failure to use "magic words" in seeking information, while still owing a duty to more sophisticated or better informed beneficiaries who are able to frame their inquiries with particularity. This conclusion is buttressed by the multitude of cases holding that a fiduciary can violate its duty by remaining silent as well as by speaking. *See Eddy v. Colonial Life Ins. Co.*, 919 F.2d 747, 750–51 (D.C.Cir.1990) ("A beneficiary about to plunge into a ruinous course of dealing, may be betrayed by silence as well as by the spoken word."); *Jordan v. Federal Express Corp.*, 116 F.3d 1005, 1016 (3rd Cir.1997) (fiduciary duty in communications with beneficiaries "entails not only a negative duty not to misinform, but also an affirmative duty to inform").

The Second Circuit's characterization of the duty sought to be imposed in *Pocchia*, a "duty to volunteer," by its very terms addresses only the situation where no inquiry of any sort is made. Such is not the case here. Instead, the Court views the precision of the inquiry as another factor to be considered when determining the materiality of any resulting misrepresentations or omissions. A plaintiff who makes a specific inquiry seeking information on golden handshakes or other retirement incentives alerts the fiduciary that such information is material to her, and a response that such changes are "only rumors" or "nothing I know of" is more likely to be materially misleading to such a plaintiff than to the claimant making a more generalized inquiry for information bearing on his or her retirement decision, but the latter's claim is not necessarily foreclosed. Rather, the nature of the inquiry factors into the determination of whether a material misrepresentation occurred. Defendant's Rule 52(c) motion (Doc. # 130) under *Pocchia* to dismiss the

claims of the representative plaintiffs who did not make a specific inquiry is therefore denied.

Defendant also contends that as there are no allegations of deliberate deception in the present case, no liability can attach for any misrepresentations made prior to the point of "serious consideration," as defined by the Third Circuit in *Fischer II*, 96 F.3d at 1539. The Second Circuit has not articulated such a rule; to the contrary, in *Ballone v. Eastman Kodak*, the court reversed a district court's decision that there can be no material misrepresentation about pension plan changes not yet under serious consideration. 109 F.3d 117, 123 (2d Cir.1997). Observing that "serious consideration of plan changes is not the sine qua non of materiality," the Second Circuit went on to outline a number of factors that district courts should consider in determining whether the alleged misstatements were material. *See* discussion *infra*.

Faced with this precedent, defendant reaches beyond the Circuit law which controls this Court's analysis, and urges adoption the First Circuit's limited interpretation of *Ballone* in *Vartanian v. Monsanto*, 131 F.3d 264 (1st Cir.1997). In that case, involving alleged misstatements about future benefit changes, the First Circuit viewed its task as that of "delineat[ing] the point at which one form of reasonable employer behavior, namely the confidential consideration of an employee severance proposal, is overbalanced by the corresponding fiduciary duty of loyalty imposed by ERISA." *Id.* The court adopted the three-part *Fischer II* test, and held that only serious consideration of changes in benefits as determined by this test triggered a duty of disclosure. In so doing, it considered and rejected the approach taken by the Second Circuit in *Ballone*. In its dicta discussing *Ballone*, the *Vartanian* court observed that "[w]e are not here presented with facts that suggest a deliberate attempt on Monsanto's part to affirmatively mislead Vartanian, and therefore

have no occasion to consider whether we would apply *Ballone* in an appropriate case." 131 F.3d at 269. Defendant reads this dicta as limiting *Ballone* to only those situations in which deliberate deception is present. As an initial matter, this Court is not bound by *Vartanian*, nor by the First Circuit's recasting of Second Circuit law. Concluding that, based on dicta from the First Circuit, the Second Circuit itself would adopt the bright-line test that it explicitly rejected in *Ballone* for all cases except those involving intentional deceit is a leap in logic that seems unfounded to this Court.

Secondly, this Court is not only bound by *Ballone*, but is convinced its nuanced approach makes more sense. As demonstrated by the analysis of the claims of the individual plaintiffs below, in certain situations the proximity of the timing, the nature of the inquiry, the status of the internal deliberations at the time and the position of the person being inquired of, can combine to create liability, even if the responses to the inquiries cannot be characterized as outright falsehoods. For instance, some salaried plaintiffs who inquired about golden handshakes only days before extending the program to salaried employees came under "serious consideration" were told that such changes were "just a rumor" or that the specially designated benefits representatives had no knowledge of any such plans. Such plaintiffs reasonably interpreted these responses as indicating that no such program would be offered, because they reasonably assumed that benefits personnel would have knowledge, and even though Ms. Guido and Ms. Pardo may not have deliberately deceived these plaintiffs, they certainly made no efforts to ascertain whether the information they were disseminating was or continued to be accurate under circumstances of potential change (commencing with the MTC negotiations), nor did they communicate that they had not inquired, and given negotiation confidentiality, might not have the

most complete information. These plaintiffs testified credibly that a very slight quantum of information would have been sufficient for them to change their retirement dates and wait for more concrete disclosures; when beneficiaries' informational needs are plainly so minimal, the failure to provide that information is concomitantly more material, regardless of whether deliberate deception is at work.

Further, the totality of the evidence in this case makes apparent that General Dynamics was decentralized to a large extent, and that many important business decisions were made at the division level. While perhaps only General Dynamics corporate officers could authorize plan changes, EB management engaged in a lengthy process of investigating, evaluating and promoting golden handshakes as a solution to the many problems the division faced. As discussed below, there may be a need to identify a fixed point at which the consideration of plan changes becomes "serious," but as a practical matter the decision-making process is rarely so delineated, stretching over a continuum, extending from mere brainstorming to final "tweaking" of a detailed plan the hour before it is announced. Given the importance of an employer's fiduciary duties under ERISA, the law interpreting the scope of those duties must be able to accommodate an ever-changing variety of business arrangements and governance structures, particularly given the recent propensity towards mega-corporate consolidation. Given this need for flexibility, adopting a bright-line rule that only purposeful falsehoods are prohibited by ERISA would not sufficiently protect beneficiaries in some situations.

Finally, even if this Court adopted the limitation on *Ballone* suggested by defendant, the record is not totally barren of evidence of conduct approaching actual deception. As laid out above, the Court credits the plaintiffs' versions of their conversations with Marie Pardo as to her responses. Ms. Pardo was present at several Golden Handshake Subcommittee meetings, and therefore knew the status of the internal deliberations, yet she and her staff still provided no factual information to beneficiaries inquiring about early retirement incentives, only responses implying inaccurately that they knew nothing of any activity on this issue, or that it was "only" a rumor. Whether Ms. Pardo took this route of "plausible deniability" because of instructions by EB or of her own choosing is not clear, but her stock responses were not, or became not, fully truthful or accurate statements, given the extent of the discussions and Ms. Pardo's participation in them. In fact, Ms. Pardo's recollection of more precise detail she claims to have given underscores the defects in what the plaintiffs heard, because the differences between the two responses demonstrate that she may have tempered both her trial testimony as well as her communications to employees, due to the cautionary tenor of the JCCP discussion on the subject of communications to which EB Counsel Hapke made significant input.

The Court is also persuaded by plaintiffs' contention that defendant's version of an employer's duty prior to serious consideration more closely resembles avoidance of intentional fraud rather than the high duty of loyalty owed by a fiduciary to a beneficiary. As the Supreme Court noted in *Varity*, such conduct can create liability even among strangers, and this Court finds that ERISA requires more of a fiduciary in discharging such duties than that he or she simply refrain from outright lying. Therefore, the Court declines defendant's invitation to graft *Vartanian*'s dicta onto *Ballone*'s carefully balanced approach, and its motion for judgment as a matter of law under *Vartanian* [doc. # 145] is accordingly denied. Instead, the Court will analyze the plaintiffs' claims under *Ballone*, giving due regard to the facts specific to this case, to determine whether defendant made material misrepresentations to the plaintiffs.

## C. Fiduciary duties under *Ballone, Becker,* and *Mullins.*

The Court has concluded based on applicable Second Circuit law that neither a specific, express inquiry on the part of the beneficiary nor deliberate deceit on the part of the fiduciary is a necessary predicate to finding an ERISA violation. It still is to be determined whether General Dynamics or its agents made misrepresentations to plan participants about changes to an employee pension benefits plan which were material and on which the plaintiffs relied. *See Mullins v. Pfizer,* 23 F.3d 663, 669 (2d Cir.1994). Defendant argues that plaintiffs have failed to demonstrate by a preponderance of evidence each of these components of their fiduciary duty claims.

1. Under the circumstances of this case, the failure to disclose complete and accurate information constitutes a misrepresentation.

■ General Dynamics would have the Court limit the first element to affirmative misrepresentations, that is, a duty not to lie. As discussed above, the Court finds the broad scope of ERISA's fiduciary duty to be at odds with this constrained construction. In explicating the nature of fiduciary duties under ERISA, courts have long found that omissions may be actionable, as well as positive statements. *See Pocchia,* 81 F.3d at 279 (employer had fiduciary duty not to make affirmative misrepresentations or omissions). For example, in *Becker v. Eastman Kodak,* 120 F.3d 5 (2d Cir.1997), the Second Circuit found a breach of fiduciary duty, based partially on the fact that the benefits counselor failed to provide "complete and accurate information" about the mechanics and timing of the election to retire. While that case will not extend as far as plaintiff would like to stretch it, because the case involved existing benefits in which both the SPD and the benefits counselor's words in combination

were found misleading, in reaching its conclusion the court cited approvingly cases such as *Eddy v. Colonial Life,* 919 F.2d 747 (D.C.Cir.1990) (employer has not only duty not to misinform but also "a duty upon inquiry to convey to a lay beneficiary . . . correct and complete material information about his status and options") and *Bixler v. Central Pennsylvania Teamsters Health and Welfare Fund,* 12 F.3d 1292 (3rd Cir.1993) (failure to advise beneficiary of benefits available to her was breach of fiduciary duty, even when inquiry limited). The conclusion that fiduciary obligations extend not only to statements but to maintaining silence when one should speak is buttressed by the common law of trusts.[4] The Restatement (Second) of Trusts states:

> [The trustee] is under a duty to communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection in dealing with a third person. . . .

Restatement (Second) of Trusts § 173, comment d (1959).

The Court also finds no merit in defendant's argument that Pardo and Guido's statements were accurate based on then-existing facts. While the Court agrees that opinions and predictions are not actionable under ERISA, and that truthful statements made in good faith but misunderstood by the beneficiary cannot constitute misrepresentations, the statements here do not fall into these categories. Pardo attended meetings where the possibility and structure of a golden handshake was discussed, helped prepare matrices of other companies' retirement incentives, and presented a paper to the subcommittee on the subject. Her noncommittal and nonfactual responses to beneficiary questions were therefore not accurate, because she did know more than nothing, consider-

---

4. In *Varity,* the Court counseled lower courts to apply these common law standards to ERISA cases while "bearing in mind the spe-

cial nature and purpose of employee benefit plans." 116 S.Ct. at 1075.

ation of a golden handshake was certainly more than a rumor, and she had also heard the EB attorney admonish the JPPC regarding the legal precautions the company felt necessary related to the timing and content of any disclosures. Moreover, the literal accuracy or truthfulness of Pardo's and Guido's statements is not the essential inquiry, because it is not Pardo and Guido who personally owed the fiduciary duty to plaintiffs; rather, these duties were owed by General Dynamics as plan administrator. The Benefits Office was the place to which all participants were channeled to receive information about retirement and pension options, and was undisputed to be the "best source of information" for employees. As Judge Feinberg wrote in the Third Circuit panel decision in *Fischer I*, fiduciary obligations "cannot be circumvented by building a 'Chinese wall' around those employees on whom plan participants reasonably rely for important information and guidance about retirement." 994 F.2d 130, 135 (3rd Cir.1993). The fact that Guido, Pardo, and other Benefits Office representatives were not kept abreast of the evolution of the company's discussions, and according to Guido were "the last to know" about developments, may say something about the manner in which information is disseminated at EB, but it does not immunize the employer from liability for statements that do not completely and accurately respond to employee inquiries, or for making material omissions.

The Court further notes that by the time the plaintiffs in this case spoke with Benefits Office representatives, Don Norman had already indicated in a July 1994 interview that EB was "looking at [golden handshakes] seriously now," but that if they were offered, it would not be until 1995. Jt.Ex. 17. As the Second Circuit held in *Mullins*, "when a plan administrator speaks, it must speak truthfully." 23 F.3d at 669. The Court construes this instruction as also requiring consistency on the part of fiduciaries; it would be of little use if a fiduciary could meet his or her fiduciary obligations by speaking truthfully on one occasion, and then burying the truth beneath a barrage of vague and nonfactual misstatements. This is particularly the case where benefits counselors, described by Marie Pardo as "employee advocates," speak with those plan participants who most need relevant information: beneficiaries contemplating retirement. Defendant's concession that Pardo and Guido's responses to employee inquiries did not match up to Norman's statement with perfect precision is an understatement. While the Court does not expect an employer as large and as decentralized as General Dynamics to always speak with one voice, it is a reasonable to require that what information is available to employees be provided to those staff members specifically designated as responsible for employee benefits and related information.

Further, the plaintiffs almost unanimously testified that the benefits office in general, and Marie Pardo in particular, were the best source for benefits-related information. Marie Pardo saw her duty as informing beneficiaries of the benefits that were available, but she did not take it upon herself to inquire further of her superiors regarding the golden handshake, even when faced with multiple questions by concerned potential retirees on a daily basis, indicating that such information was material to them. Rather, she and her subordinates responded "I don't know," or even more dismissively, "they're just rumors." These responses connote more than simple ignorance of EB's plans, given Pardo's position and beneficiaries' reliance on her. Such responses convey to employees that no changes are in the works, because if any were then certainly the benefits office would know, and that any speculation to the contrary belongs in the province of sheer speculation, rather than fact.

Given these circumstances and the Court's credibility determination regarding Pardo and the individual plaintiffs, the Court is persuaded that misrepresentations have been shown. A fiduciary can-

not leave its front-line benefits counselors in the dark, or instruct them to give non-committal and nonfactual responses to inquiries regarding potential benefit changes, if the information that is withheld is material to beneficiaries. Such a stance is inconsistent with the mandate that a fiduciary discharge its duties with the care, skill, prudence and diligence required by the statute. 29 U.S.C. § 1104(a)(1)(B); *Donovan v. Bierwirth,* 680 F.2d 263, 271 (2d Cir.), *cert. denied,* 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982) (pursuant to a fiduciary's duty of loyalty, all decisions regarding an ERISA plan "must be made with an eye single to the interests of the participants and beneficiaries."). Even if the failure to provide complete and accurate information was unintentional, inadvertent omissions can also rise to the level of fiduciary breaches. *See Berlin,* 858 F.2d at 1163 (administrator and fiduciary had duty "not to make misrepresentations, either negligently or intentionally, to potential plan participants"). The Court finds this particularly the case in the situation where an employer intends that certain personnel will serve as the repository of benefits-related information, and knows the kind of information that beneficiaries are ordinarily seeking in their inquiries to these individuals.

### 2. Materiality of Misrepresentations

The inquiry does not end once misrepresentations by a fiduciary are found; rather, the Court must go on to analyze whether they were material to the plaintiffs. This determination is a mixed question of law and fact, based on whether there is a substantial likelihood that the misrepresentation would mislead a reasonable employee in making an adequately informed decision about if and when to retire. *Mullins,* 23 F.3d at 663. As noted above, *Ballone* laid out a number of factors to consider when determining materiality, including "how significantly the statement misrepresents the present status of internal deliberations regarding future plan changes; the special relationship of trust

and confidence between the plan fiduciary and beneficiary; whether the employee was aware of other information or statements from the company tending to minimize the importance of the misrepresentation or should have been so aware, taking into consideration the broad trust responsibilities owed by the plan administrator to the employee and the employee's reliance on the plan administrator for truthful information." 109 F.3d at 125. While the factual conclusions for the individual plaintiffs are laid out below, certain factors in the *Ballone* test will be common to all plaintiffs, and the Court examines these at the outset.

### a. Principles of Serious Consideration

As noted above, while serious consideration is not the "bright line" for determining materiality that it is in some circuits, it still is relevant to the question.

The concept of "serious consideration" first appeared in the Second Circuit's ERISA jurisprudence in *Mullins,* 23 F.3d at 669. In that decision, the court aligned itself with two other circuits in concluding that plan fiduciaries have a duty "not to affirmatively mislead participants" regarding future plan changes. *Id.; see also Fischer v. Philadelphia Elec. Co.,* 994 F.2d 130 (3rd Cir.1993) (*Fischer I*); *Berlin v. Michigan Bell Telephone Co.,* 858 F.2d 1154 (6th Cir.1988). The *Mullins* court cited to both these decisions in concluding that "[w]hether a plan is under 'serious consideration' at the time a misrepresentation is made is relevant to materiality." 23 F.3d at 669. The court also quoted *Fischer I*'s articulation of the "sliding scale" of materiality. "All else equal, the more seriously a plan change is being considered, the more likely a misrepresentation, e.g., that no change is under consideration, will pass the threshold of materiality." *Id.* (*quoting Fischer I,* 994 F.2d at 135). Neither *Fischer I* nor *Mullins,* however, clearly articulate what is meant by serious consideration.

The Third Circuit revisited the issue in *Fischer v. Philadelphia Elec. Co.*, 96 F.3d 1533 (3rd Cir.1996) (*Fischer II*). The court noted that the concept "recognizes and moderates the tension between an employee's right to information and an employer's need to operate on a day-to-day basis.... A corporation could not function if ERISA required complete disclosure of every facet of these on-going activities." *Id.* at 1538. Accordingly, the Third Circuit attempted to demarcate more clearly the point at which an employer's fiduciary duty outweighs its right to make appropriate business decisions. It concluded:

> Serious consideration of a change in plan benefits exists when (1) a specific proposal (2) is being discussed for purposes of implementation (3) by senior management with the authority to implement the change.

*Id.* at 1539. The court then went on to discuss each element.

> The first element, a specific proposal, distinguishes serious consideration from the antecedent steps of gathering information, developing strategies, and analyzing options. A company must necessarily go through these preliminary steps before its deliberations can reach the serious stage. This factor does not mean, however, that the proposal must describe the plan in its final form. A specific proposal can contain several alternatives, and the plan as finally implemented may differ somewhat from the proposal. What is required, consistent with the overall test, is a specific proposal that is sufficiently concrete to support consideration by senior management for the purpose of implementation.
>
> The second element, discussion for implementation, further distinguishes serious consideration from the preliminary steps of gathering data and formulating strategy ... This factor recognizes that a corporate executive can order an analysis of benefits alternatives or commission a comparative study without seriously considering implementing a

> change in benefits.... Consideration becomes serious when the subject turns to the practicalities of implementation. The final element, consideration by senior management with the authority to implement the change, ensures that the analysis of serious consideration focuses on the proper actors within the corporate hierarchy. As noted, large corporate entities conduct regular or on-going reviews of their benefit packages in their ordinary course of business. These entities employ individuals, including middle and upper-level management employees, to gather information and conduct reviews.... As a general rule, such operations will not constitute serious consideration. These activities are merely the ordinary duties of the employees. Until senior management addresses the issue, the company has not yet seriously considered a change.... This focus on authority can be used to identify the proper cadre of senior management, but it should not limit serious consideration to deliberations by a quorum of the Board of Directors, typically the only corporate body that in a literal sense has the power to implement changes in benefits packages. It is sufficient for this factor that the plan be considered by those members of senior management with responsibility for the benefits area of the business, and who ultimately will make recommendations to the Board regarding benefits operations.

*Id.* at 1539–1540.

The court supported its decision as "protect[ing] the right of employees to material information," *id.* at 1541, as employees will learn of potential changes when internal deliberations have reached the point "where an employee should reasonably factor the potential change into an employment decision." Finally, the court noted that, as a matter of policy, imposing liability too quickly could harm employees by deterring employers from resorting to such plans, and by forcing companies into

layoffs, the primary alternative to retirement inducements. *Id.*

Other circuits have since adopted the Third Circuit's formulation, although with some variations. As noted above, the First Circuit adopted the *Fischer II* factors as determinative of when an employer's duty attached, rejecting *Ballone*'s multi-factor analysis, and making explicit the requirement that the specific proposal under consideration would apply to a person in plaintiff's position. *Vartanian,* 131 F.3d at 268. The Tenth Circuit has also adopted the *Fischer II* formulation in *Hockett v. Sun Company,* 109 F.3d 1515, 1523 (10th Cir.1997). On the facts of that case, the circuit court concluded that there was "no intersection of the three *Fischer II* factors" until the heads of all departments related to employee benefits, as well as the presidents of both the subsidiary and parent corporation, gathered to discuss a specific voluntary termination proposal. 109 F.3d at 1524. Pertinent to this case, the *Hockett* court also noted that no new cost-analyses or actuarial work occurred prior to this meeting, and "[w]hile cost-analysis or actuarial work is not a necessary prerequisite to serious consideration, it is unlikely that a specific proposal would be sufficiently concrete without some such information." *Id.* at 1525.

In contrast to the rule in *Hockett,* which required the participation of top executives at both the subsidiary and the corporate parent, the Ninth Circuit recently held that consideration of retirement incentives by a corporate division's senior management alone could be sufficient to trigger fiduciary duties, if that division was essentially self-managed. *Bins v. Exxon Co.,* 220 F.3d 1042 (9th Cir.2000). Drawing on principles of corporate law, the court noted that in some corporate structures, the corporate parent may function similarly to a board of directors vis-a-vis a division, in that it serves primarily in an oversight role, allowing the division a substantial degree of autonomy and self-management. *Id.* In such a case, the *Bins* court analo-

gized to the *Fischer II* caution that serious consideration should not be limited to "deliberations by a quorum of the Board of Directors, typically the only corporate body that in a literal sense has the power to implement changes in benefits packages." *Id.* (*quoting Fischer II,* 96 F.3d at 1540). The Ninth Circuit noted that "[t]he fact that Exxon Corporation may be the only corporate body that 'in a literal sense' can implement benefits changes by placing its imprimatur on a proposal from [division] management should not necessarily push back the date of serious consideration in this case to the date on which the [retirement incentive] proposals landed on desks at Exxon." *Id.* at 1051. The court remanded the case to the district court to determine the nature of the relationship between the division and the parent, specifically instructing the lower court to assess whether the parent's role in the division's business operations was "actively managerial or characterized more properly as one of oversight." *Id.* at 1052.

The Ninth Circuit also examined the issue of when serious consideration occurs in the context of collective bargaining negotiations in *Wayne v. Pacific Bell,* 189 F.3d 982, 986 (9th Cir.1999). In that case, the court reversed a district court's determination that the point of serious consideration was not reached until a new collective bargaining agreement with the union was signed.

> Whether the Union accepted the [early retirement incentive] proposal was immaterial to the question of whether Pacific was giving it "serious consideration" under *Fischer II* and *Bins* . . . . Just as an employer is free to engage in business activities without violating its fiduciary duties under ERISA, an employer is free to assert its business interests in collective bargaining. But the fact that an employer-fiduciary has no obligation to bargain in its employees' interests . . . does not mean that it is free during a period of collective bargaining to withhold information from

plan participants in violation of its fiduciary duty under ERISA.

*Id.* at 988 (citations omitted).

These cases indicate that the question of when serious consideration occurs is by nature a fact-specific, case-by-case analysis, and that a complete proposal on the desk of the corporate parent's CEO awaiting his or her signature is not, in every situation, synonymous with serious consideration. While the Second Circuit has not adopted the *Fischer II* three-prong test, the cases provide some guidance to this Court in determining the point at which EB and General Dynamic's consideration of the golden handshake program was sufficiently serious that it may be material to employees considering retirement.

b) Serious Consideration of Plan Changes for Various Employee Groups

■ Considering the testimony and documentary evidence offered in this case, the Court concludes that offering a golden handshake to the MTC population was under serious consideration no earlier than May 2, 1995, when EB pitched its proposal to the senior management responsible for benefits decisions at the preliminary economic parameters meeting. At that point, the senior executives at the division concurred that a retirement incentive was needed to preserve critical skills and reduce the bidding rate while still making the necessary workforce reductions. Although the senior GD executives at that meeting were not immediately persuaded by Norman's presentation, and requested additional information, the issue was still before them with sufficient specificity and for the purpose of implementation to constitute the commencement of serious consideration. The fact that the highest echelons of GD management were not present at this meeting also does not preclude dating serious consideration as of this point. In the Court's view, unanimity of executive views is not required in order to demonstrate serious consideration, nor is the active participation of every person who would ultimately have to sign off on the proposal before it became official. In other words, serious consideration does not start at the point when finality is in view, only when the journey down the final road has begun.

The fact that union ratification was necessary before the retirement incentive could be announced is not in itself reason to push back the date of serious consideration, particularly given that Norman knew that such approval was a near inevitability. Nor does the company's desire to keep confidential its internal deliberations regarding proposals for collective bargaining trump its fiduciary duties in this situation. While the Court recognizes EB's interest in maintaining confidentiality of the bargaining process and keeping its negotiating "cards" close to its chest, Norman testified that he saw no harm in communicating to employees the same information he shared with the EB News in July of 1994: that the company was seriously considering the issue, but there were no guarantees. In fact, this is the information that Pardo claims to have given the plaintiffs, although none of the nineteen who testified recalled being so informed. Further, to the extent absolute secrecy is necessary in order for the employer to achieve its collective bargaining goals, an employer could avoid a conflict between its negotiating strategy and its fiduciary obligations under ERISA by extending any offer back to those who retired in the immediate past. This allows employers to keep internal deliberations secret while remedying concomitant detrimental reliance by employees who inquired during the relevant time period. ERISA does not require such retroactivity, of course, but it is an example of a method of accomodating the fiduciary-employer's competing interests in the collective bargaining context without sacrificing the employees' entitlement to complete and accurate information.

But the Court is also not persuaded that the MTC golden handshake was under serious consideration at any time earlier than May 2, 1995. The brain-storming and information-gathering sessions of the Golden Handshake Subcommittee served an important function in the evolution of the concept, and may have gone a long way towards improving labor-management relations at EB. But there was no evidence that senior management at the corporate parent were aware of such discussions, or that the subcommittee was granted any authority to make decisions regarding implementation of the golden handshake. In the language employed by the Ninth Circuit in *Bins*, GD was more "actively managerial" in its relationship with its division, rather than serving merely an oversight role. While participation by senior management of the corporate parent is not a prerequisite for serious consideration in every case, and in some corporate contexts a subsidiary or division may have ample authority and discretion to implement benefits changes such that corporate approval is but a rubberstamp for a decision that was effectively made at lower levels, the evidence in this case indicated that EB was kept on a fairly short leash by GD corporate on economic matters. Despite Norman's conviction that a golden handshake was necessary, he had no authority to make any early retirement offer at the bargaining table without previous GD approval. Given the corporate structure for decision-making on benefits issues, serious consideration in this case did not occur until senior management responsible for benefits at both EB and GD were reviewing the topic. Similarly, the simple fact of the Newport News and Land Systems' retirement incentive programs did not predict the golden handshake at EB such that the date of serious consideration could be pushed back into 1994 or early 1995, given the dissimilarities between the Land Systems and EB retirement incentive programs, and Norman's credible testimony that Newport News was not a factor in his decision.

Instead, the earliest point at which the three *Fischer* factors intersected was at that preliminary economic parameters meeting on May 2, 1995. There, the senior executives responsible for benefits at both the division and corporate level were discussing a number of alternative proposal in specific terms, as the actuarial liabilities had been estimated for each eligibility criteria. The context of this economic parameters meeting demonstrates that these proposals were being discussed for implementation, as it was convened for the purpose of determining what offers and counteroffers EB management would be authorized to make in the MTC collective bargaining negotiations. Accordingly, while May 2, 1995 is not the dispositive cut-off date for all MTC plaintiffs, as per *Ballone*, it does provide a benchmark for determining the status of deliberations at the time particularly employees made their inquiries.

█ As to employee populations other than MTC members, the time line is not so clear. Norman testified credibly that he was completely focused on the MTC, and that offering the enhancements to other groups was not even on his "radar." Turner indicated that ratification of the contract by the MTC was the most pressing concern, because the need for layoffs was more imminent in that group. Turner Test. at 783–84. The concerns outlined above with respect to reducing the workforce and maintaining critical skills for the delivery departments were not implicated with the other employee groups; Norman testified that skill levels for salaried employees did not plateau or drop off as quickly as they did for those in the yard, for whom the required extreme physical agility declined with age. Norman Test. at 369. Engineering employees were being added to the company's payroll, in fact, in keeping with the company's move towards new designs for attack submarines. Further, aside from generalities regarding the perceived "fairness" of offering the same retirement package to the various employ-

ee groups, there was no evidence of any link between union-negotiated benefits and the benefits offered to salaried and non-union personnel.

At the first economic parameters meeting on May 8, 1995, GD faulted Norman for failing to cost out the liabilities of offering early retirement incentives to the entire EB population, because, as Mancuso testified, corporate was concerned that any early retirement incentives offered to the MTC might "at some point in time" also be offered to the other employee populations at GD. Mancuso Test. at 737. It was the consensus of the officials at the meeting that the financial impact of extending such a program should be calculated, and beginning on May 9, David McLean of the Hayes Group sent impact estimates to General Dynamics. *See, e.g.,* Def.Ex. 410, 411. Norman also sent Migdail a "Liability Study" calculating the amounts required to fund the 55/10 and "Magic 85" golden handshake proposals for all employee groups. P.Ex. 70 (under seal). He did not request approval for extending such an offer to the salaried and non-union hourly employees at the June 1 economic parameters meeting, but given the state of labor relations at EB, any retirement incentives would have to be offered to the MTC first to avoid exacerbating the tension between the parties at the bargaining table and perhaps scuttling a deal that was necessary to EB's economic future. The MTC golden handshake was certainly a priority, but the link between ratification of the MTC contract and the possibility of offering benefits enhancements to any other groups is further demonstrated by the timing of Norman's proposal to GD to extend the golden handshake to the salaried and non-union hourly employees, coming as it did only days after the ratification vote. While there was evidence that the decision to offer the MTC golden handshake was made much easier by the fact that the pension plan was overfunded, Mancuso testified that the same analysis had not been conducted for the remaining employee groups. Mancuso Test. at 748.

The Court finds, therefore, that extending the golden handshake plan to salaried and non-union employees was not under serious consideration until June 1, 1995. The cost liabilities had been estimated at that point, and although Norman did not request approval to extend the offer at the June 1 economic parameters meeting because he was not focused on that issue, Mancuso's testimony demonstrates that it . was seriously on the mind of GD corporate. All of the prongs of the *Fischer II* test were met as of that point: senior management at the parent company was analyzing a specific proposal, modeled on the MTC proposal. That the discussions were aimed at implementation can be inferred from the fact that when Norman finally did request approval for the salaried and non-union hourly offer on July 5, 1995, corporate responded in the affirmative in less than a week. Norman Test. at 555. Indeed, it seems that the only debated issue was the timing of the offer, as on July 12 Norman was given permission to announce the program, only to have that authorization pulled at the last minute in order to seek final Board approval. *Id.* Given the healthy financial condition of the pension plan, the absence of serious debate about Norman's proposal, and the fact that top management at General Dynamics sought the additional pension liability analysis, the Court concludes that defendant was seriously considering pension plan enhancements for the salaried and non-union population as of June 1, 1995.

The MDA golden handshake, however, was subject to serious consideration only much later. Although the MDA golden handshake was costed out along with the rest of the EB workforce, no such program could be implemented outside the collective bargaining process, and the evidence did not show that the MDA golden handshake was being considered with any seriousness prior to the beginning of its contract negotiations in May of 1996. Nardone's statement to the Engineer-

ing/MDA News in December of 1994 is equivocal about the possibility of golden handshakes, as he recognizes that they "may help [EB] get through the manpower reductions," but they would cause "additional pressures on our overhead." Although Norman stated in his interview with the EB News that the company was "looking at financial incentives . . . that we could implement across the board," the Court credits his testimony that he was concerned only with the MTC at that point.

The collective bargaining background of the MDA's golden handshake also differs from that of the MTC. Non-economic collective bargaining did not begin until May of 1996, and the president testified that while he felt there was "an opportunity for [the MDA] hopefully to get" the golden handshake for its long-term employees due to the MTC contract, the outcome was far from certain. The MDA, which represented technical design employees, actually increased its membership from 1993 to 1996, as EB was focusing on new designs for the Centurion class submarine and so was training and hiring new employees. Olssen Test. at 957. Retaining critical skills was also not an issue for MDA employees, and Olssen testified that he believed the company was more concerned about losing valuable, experienced employees. *Id.*

The MDA and EB also kept their negotiations confidential, and only communicated with the membership at large via joint bargaining updates. While in the case of the MTC, EB's desire for secrecy and negotiating leverage did not trump its fiduciary duties under ERISA, there all logic pointed to the inescapable conclusion that a golden handshake would be offered; the same cannot be said for the MDA. Absent any of the special circumstances shown with the MTC, the Court finds no reasoned legal or factual basis to find that adoption of retirement incentives were under serious consideration prior to the initiation of collective bargaining discussions with the union. On these facts, the Court finds that the MDA golden handshake was not under serious consideration until mid-July 1996, when economic bargaining started.

### D. Individual Plaintiffs

#### 1. "Phase One" Plaintiffs

■ A group of nineteen plaintiffs have been designated "Phase One" plaintiffs by the parties, because they were originally to be tried in the first phase of a bifurcated trial. These retirees are grouped together because they made no specific inquiries related to the potential for future retirement incentives. The Phase One plaintiffs came from all four employee groups—MTC, Salaried, Non-union hourly, and MDA. Certain common threads ran through the testimony of these plaintiffs, however. None of these plaintiffs had ever heard of the JPPC, its Golden Handshake Subcommittee, or the JPPC Update. All plaintiffs testified that they believed the Employee Benefits office was the best place to get information about benefits, including retirement benefits, and had no reason to look for such information in company newspapers or related union publications. All plaintiffs went to speak with EB's employee benefits counselors, of whom they inquired about their retirement benefits and options, and variations on the theme of wanting all the information necessary to maximize their retirement benefits. Except for Jane Imdahl, all the plaintiffs testified that they had heard no rumors regarding the possibility of a golden handshake or other retirement incentives, and all plaintiffs, except for William Carroll, went to the Benefits Office with a general idea of when they wanted to retire. The distinguishing characteristics of each individual plaintiff are discussed below.

#### Kenneth D. Brunelli

Mr. Brunelli was a salaried employee who retired effective April 1, 1995. He spoke with Employee Benefits about retirement on February 28, 1995, and in his

conversation with Theresa Materas, a benefits office representative, he did not make any inquiry that referenced potential changes to benefit plans or included any forward-looking element. Instead, he asked her to tell him everything she knew to "maximize his retirement benefits." He had already received a lay-off notice, and he would have been laid off in March of 1995, prior to serious consideration by EB or General Dynamics of whether to offer retirement incentives to salaried employees. Mr. Brunelli testified that he believed he would have been able to avoid that lay-off, because he was managing purchasing contracts worth several hundred million dollars but two younger individuals had been retained to manage those contracts. The Court finds his expectations too speculative, lacking sufficient evidentiary basis that EB would have reversed the decision to lay-off Mr. Brunelli, and instead terminate the two younger replacements. Mr. Brunelli's testimony suggests his belief of age discrimination, but offered no evidence that he had made such a claim such that a reversal of EB's decision could be inferred to have been under review. In addition, Mr. Brunelli's very general inquiries occurred more than three months prior to defendant's serious consideration of offering the golden handshake to salaried employees. *See supra* at 253. Due to the very general nature of his inquiries, the timing of such inquiries, and Mr. Brunelli's lack of evidence that he would otherwise have had the option to extend his employment at EB such that he could have participated in the Golden Handshake had he been informed that one was under consideration, the Court finds that any misrepresentations made to Mr. Brunelli were not material, and thus General Dynamics did not breach its fiduciary duties.

### Jane Imdahl

Ms. Imdahl's retirement was effective July 1, 1994. Ms. Imdahl was a salaried employee at the time of her retirement, but she had been an MTC member in the past, so a portion of her pension came from the MTC Plan. Stip. ¶ 28. Ms. Imdahl began her inquiries in March of 1994, when she spoke with an unidentified female benefits counselor. She spoke with this individual approximately three times, but it was only in the first March 1994 meeting that she "jokingly" made a comment to the effect of "I guess there is not going to be any golden handshake." Ms. Imdahl testified that she had heard that another General Dynamics division had received early retirement incentives, and there were ruminations in the proverbial water cooler chatter that the same might be offered to EB employees. When she received no response to her comment, Ms. Imdahl assumed that there was no foreseeable early retirement incentive so she continued with her retirement plans. Ms. Imdahl testified that she had no particular reason for choosing her July 1, 1994 retirement date and that she selected that date without input from the Benefits representative.

The fact that Ms. Imdahl characterizes her comment as "joking" does not drain it of any import. Ms. Imdahl's exchange with the benefits representative implicates the fiduciary's duty to be complete in the provision of information, as discussed in *Becker*, 120 F.3d at 5. There, as discussed above, a terminally ill employee made a statement that "she could retire anytime, right?" The benefits counselor responded "right," even though the plan provided that retirement could only be effective on the first of the month, and if the employee passed away prior to the first of the month, she would lose the option of selecting a lump-sum option. The *Becker* court held that in doing so, the benefits counselor provided the beneficiary with materially misleading information, because the comment exacerbated the lack of clarity in the SPD. *Id.* at 10. In essence, *Becker* imposes a "duty to correct," in the face of a statement demonstrating a material misunderstanding of benefits information, on plan fiduciaries in certain situations.

While *Becker* is germane due to the nature of Ms. Imdahl's inquiry, it does not control the outcome of her claim. Ms. Imdahl's inquiry occurred well prior to the events found by the Court to constitute "serious consideration" of benefit changes as to salaried employees, and therefore the Court must employ the *Ballone* factors to determine whether the failure to correct Ms. Imdahl constituted a breach of fiduciary duty. These include 1) how significantly the statement misrepresents the present status of internal deliberations; 2) the special trust and relationship between fiduciary and beneficiary; 3) whether the employee was aware, or should have been aware, of other information from the company that would lessen the importance of the misstatement; and 4) the specificity of the statements. In accordance with the Court's application of *Pocchia*, the Court also looks to the specificity of the employee's inquiry. As to the second factor, while defendant extracted a concession from each plaintiff that they did not have a "special relationship" with any of the benefits counselors, the Court believes that the evidence supports the existence of a type of special relationship, by form and title, where employees are directed to and channeled through specially designated employee benefits counselors, in order to receive crucial information about their benefits.

Even given the "special relationship" that may have existed between Ms. Imdahl and the benefits counselors, the failure to speak here occurred prior to any consideration whatsoever of offering the retirement incentives to salaried workers, and any omissions or misstatements thus did not significantly misrepresent the status of internal deliberations. While Ms. Imdahl was not aware of the "mix of information" that may have been available at EB, such as the Norman interview in the EB News, there was very little that could have been disclosed by EB at the time of Ms. Imdahl's retirement, given the nascent stages of the discussions. In these circumstances, the Court finds that any failure to correct Ms. Imdahl did not constitute a breach of General Dynamics' fiduciary duty.

### Larry Schuhardt

Mr. Schuhardt began inquiring about retirement in January of 1994, and retired effective April 1994, more than a year prior to the point identified by the Court as constituting "serious consideration" of golden handshakes for the MTC. At that time, he was on restricted duty due to a back injury, and his job responsibilities, according to his own characterization, consisted of "dusting" and "sitting in a broom closet." Mr. Schuhardt testified that he felt "downgraded" by this assignment, and he did not want to stay employed at EB any longer than necessary. In his testimony, Mr. Schuhardt emphasized that he was seeking truthful information when he spoke with an unidentified female benefits officer regarding "what were the best and maximum benefits [he] could receive if [he] retired."

Mr. Schuhardt was an MTC member, and was aware that the MTC would negotiate a new collective bargaining agreement the following year and that the MTC may have been able to achieve improved retirement benefits during those negotiations. While General Dynamics contends that Mr. Schuhardt's failure to take account of this possibility for change renders any omission on the part of EB immaterial, the Court notes a qualitative difference between what a union seeks in negotiations and what an employer has under "serious consideration" at the time. Mr. Schuhardt's demeanor and testimony, however, demonstrate that he was disgruntled with his work situation at EB and intent upon retiring, because "why should [he] stay here and waste [his] life away," regardless of future changes. While Mr. Schuhardt was unaware of the "mix of information" available from other sources, such as the JPPC News or the Norman interview in the EB News, his inquiries into maximizing his benefits occurred at a time when the deliberations regarding the golden

handshake were, at most, in the preliminary stages, as the Golden Handshake Subcommittee had not yet even been formed. Thus, the Court finds that it is unnecessary to determine whether inquiries as oblique as Mr. Schuhardt's could have triggered a duty if made at a later stage of collective bargaining, since the timing of his questions was much too premature to require a more specific factual response on the part of EB. Given the timing of his inquiries, and his trial testimony suggesting that his retirement plans were concrete, any misrepresentations that were made to Mr. Schuhardt were not material, and accordingly he has failed to demonstrate that General Dynamics breached its fiduciary duty with respect to his pension by failing to disclose the possibility of retirement incentives.

**Robert Charbonneau**

Mr. Charbonneau was a non-union hourly employee who worked at EB's Quonset Point facility. He began inquiring into the possibility of retirement in January or February of 1994, and spoke on at least two occasions with Diane Turner and Charlene Hunter, representatives in the Quonset Point Human Resources office. He testified that in his discussions with them, he was looking for the "best possible benefits" as to the amount of his monthly pension and his health insurance. As recounted by Mr. Charbonneau, his inquiries contained no suggestion that he sought information on future changes, and lacked any reference to future changes. Under the "mix of information" prong, Mr. Charbonneau was unaware of the JPPC, and he testified that he had not read anything regarding the possibility of a golden handshake in any of the company newspapers, because he worked away from the main EB facility from which most communications issued. In January, Mr. Charbonneau had received a lay-off notice that

would have been effective February 28, 1994. Mr. Charbonneau testified that he believed he would have been called back had he not retired, based on the fact that other welders at Quonset Point had returned after lay-off, but the Court views such testimony as too speculative to provide adequate proof that could have altered the effect of his February 28, 1994 layoff. Based on this fact, combined with the general nature of his inquiries and the lack of any serious consideration being given to offering retirement incentives to non-union hourly workers at the time of his retirement, any misrepresentations that were made to Mr. Charbonneau were immaterial under *Ballone*. The Court concludes that General Dynamics did not breach any fiduciary duty when it failed to advise Mr. Charbonneau of the possibility of early retirement incentives in March of 1994.

**William Barlow**

Mr. Barlow had been a member of the MTC before, but at the time he began considering retirement in February of 1995, he was a salaried employee.[5] He spoke with Sara Guido in the EB Benefits Office sometime in mid-February, 1995, and did not ask about future plan changes, nor did he inquire about when to retire. Instead, he made a general inquiry regarding the benefits and options to which he was entitled at that time. Mr. Barlow testified that he was considering retiring at that time because he was 62, and eligible for early Social Security retirement benefits which would have been reduced had he kept working. Mr. Barlow testified that nonetheless he would have remained employed and postponed his retirement had he known that the golden handshake was under consideration. At the time Mr. Barlow made his inquiries, however, extending the golden handshake retirement

---

5. Mr. Barlow, like Ms. Imdahl, also was a participant in the MTC Plan by virtue of his former membership in the union. Stip. ¶ 28. Some portion of his pension was thus attributable to the MTC Plan, and would have been affected by collective bargaining negotiations. No evidence was presented regarding the portion of his pension that would have increased had he been informed about the prospects of benefits changes and remained employed.

incentive to salaried employees was not under serious consideration by EB, and to the extent his pension would have been affected by the collective bargaining negotiations, discussions with the MTC had not yet reached the point of serious consideration. Therefore, *Ballone* requires a weighing of various factors to determine whether EB's failure to inform Mr. Barlow constituted a material misrepresentation or omission.

As to the "mix of information" factor, like Mr. Charbonneau and Mr. Brunelli, Mr. Barlow had never heard of the JPPC, nor had he read anything regarding retirement incentives in the EB News or other company papers; according to Mr. Barlow, this is why he did not ask Ms. Guido anything about possible retirement enhancements. Unlike Mr. Charbonneau, however, it is not clear whether Mr. Barlow worked at a remote facility that might explain his lack of awareness. In addition, his retirement on May 1, 1995 pre-dated serious consideration for the salaried workforce by a month, and his meetings with Guido occurred months prior to any actuarial cost estimates for the salaried workforce. As he did not inquire specifically about retirement incentives, and as the internal deliberations regarding salaried employees were in the most nascent stages in February of 1995, Guido's failure to inform him of the JPPC discussions and the planned MTC negotiations did not constitute a significant misrepresentation of the status of internal deliberations. Added to the *Ballone* analysis are additional ingredients, such as the fact that due to Social Security, Mr. Barlow had a fixed retirement date in mind when he spoke to Ms. Guido, and was concerned that he retire prior to the point his income for the year reached the Social Security cap. Based on the evidence presented, the Court concludes that any failure to specifically inform Mr. Barlow regarding the consideration being given to offering retirement enhancements was not a material misrepresentation.

### William Carroll

Mr. Carroll was a non-union hourly employee at the Quonset Point facility who retired effective June 1, 1995. Mr. Carroll is unique in the group of Phase I plaintiffs, since he had no specific retirement date in mind when he went to speak with a Quonset Point benefits counselor, Diane Porter, in March of 1995. Mr. Carroll's testimony that he asked Ms. Porter "when would be a good time to retire?" to which she responded "any time," is undisputed. Although this statement does not expressly reference future benefit changes, it does indicate that he was open to suggestion regarding the optimal timing of his retirement, which obviously is potentially influenced by the possible offer of an early retirement incentive. Indeed, Mr. Carroll testified that he would have delayed his retirement if Ms. Porter had told him that the office was too busy to process his paperwork such that his retirement would have been inconvenient at that time.

The flaw in Mr. Carroll's claim is the timing of his request. He spoke to Ms. Porter in March of 1995, and while he testified that he spoke to her twice, there was no evidence regarding the date of his second meeting. Extending an early retirement incentive to non-union hourly plaintiffs was under serious consideration at the highest corporate levels on the effective date of his retirement, but his first inquiry took place before even EB management had considered such an extension, and months before any actuarial or cost analyses were commissioned. The MTC golden handshake was under serious consideration at the time, and while there was testimony regarding the perceived "trickle up" or "trickle down" effect of MTC-negotiated benefits, and the highest executives at GD corporate recognized that offering an MTC golden handshake might engender expectations of the same in the other employee groups, as evidenced by their May 2 request for actuarial calculations including the entire workforce, there was no evidence of historical patterns of reli-

ably predictable linkages between the benefits offered to MTC and non-union employees, nor did Mr. Carroll testify that information regarding the status of possible changes to the MTC retirement plan would have been in some way important to him. The fact that the MTC golden handshake was under serious consideration at the time of his inquiries, then, is insufficient to demonstrate that the failure to provide such information was a material misrepresentation to this non-union employee.

■ Therefore, a breach of fiduciary duty by defendant could only be found in defendant's failure to voluntarily advise Mr. Carroll of the golden handshake possibility as he was retiring; that is, breach of a theoretical, ongoing "duty to update" where the employer's circumstances have changed but there has been no renewed employee inquiry.

Such a duty has been recognized in the securities context. For instance, in *In re International Business Machines Corp. Securities Litig.*, 163 F.3d 102 (2d Cir. 1998), the court noted that "[if] and when a speaker learns that a prior statement was misleading when made, a duty to correct arises." *Id.* at 109 (internal citations omitted). In addition, a duty to update "may exist when a statement, reasonable at the time it is made, becomes misleading because of a subsequent event." *Id.* This Court has recognized a "duty to correct," which may apply to affirmative misrepresentations made by an ERISA fiduciary, if that fiduciary knew or should have known that such misrepresentations had been made and that a beneficiary would rely on them in planning the timing of his or her retirement. *See Mullins v. Pfizer*, 899 F.Supp. 69, 77 (D.Conn.1995). The Sixth Circuit has also recognized a duty to correct or update written statements by an ERISA fiduciary, because "[w]hen a representation is written, it is ongoing, and may become subject to a duty to correct if it in fact becomes misleading." *McAuley v. IBM*, 165 F.3d 1038, 1046 (6th Cir.1999).

The Ninth Circuit, however, recently concluded that a duty to update should not be imposed, even if the employee inquires before serious consideration occurs but then retires after that point is reached, unless the employee asks to be kept abreast of possible plan changes, and the employer provides assurances to that effect. *Bins*, 220 F.3d 1042, 1047.

The Court concludes that a duty to update should not apply in this situation. At the time of Carroll's inquiries, no plan to offer retirement enhancements to non-union hourly workers was under consideration, nor were any written statements involved such that this Court would have to decide whether to follow *McAuley*. While Carroll had inquired in February as to the timing of his retirement, he had not made a specific inquiry regarding early retirement incentives that, once more information became available, could reasonably be expected to trigger the memory of a diligent benefits counselor. To impose an ongoing "duty to update" in the face of such a nebulous inquiry would, in effect, undercut *Pocchia* by slipping a duty to voluntarily disclose in through the backdoor. The onerous nature of such a duty can be seen from the practicality of implementation, requiring an employer to maintain employee records of when and what employee inquiries were made, in order to seek out such employees to whom updated information should be released. The fiduciary provisions of ERISA and interpretive case law do not impose such an extensive duty. In effect, by declining to impose a duty to update on a fiduciary at the point benefit changes come under serious consideration but absent any inquiry, the burden is therefore on the beneficiary to be mindful to continually re-ask benefit change questions in order to re-trigger an employer's duty to disclose. But in the balancing of the competing interests under ERISA that the Second Circuit requires, *see Pocchia*, 81 F.3d at 278, the Court concludes that the burden on the employer outweighs any unfairness to individual em-

ployees, where employees who rest their retirement timing decision on the absence of any potential future changes can, with little effort, update their information up until the final point at which they can change the effective date of their retirement.

As GD here had no duty to update Mr. Carroll regarding the possibility of retirement enhancements, Ms. Porter's statement in February of 1995 that "anytime" would be a good time to retire was not a material misrepresentation. His inquiry regarding the timing of his retirement referenced future benefit changes in only the most generalized way, and her response was not a specific, factual assurance, nor did it misrepresent the status of internal deliberations regarding benefits improvements for the non-union hourly employees. Accordingly, his claim of breach of fiduciary duty fails.

### 2. Representative Plaintiffs

This group of plaintiffs were selected as representative of the group of 89 plaintiffs as a whole such that the Court's findings would provide guidance for resolution of the remaining plaintiffs' claims.

**Thomas Teixeira**

Mr. Teixeira was an MTC member who retired February 1, 1995, approximately one month before EB and General Dynamics received McLean's analysis costing out the pension liabilities of the MTC golden handshake. Mr. Teixeira did not read about the golden handshake in the EB News or the JPPC Update, because he was out on disability leave from approximately November of 1993 until January of 1995. Mr. Teixeira had no income for this time period, until January 1995 when he began receiving Social Security Disability payments. Mr. Teixeira began looking into retirement at that point, and spoke to a Dave Elks, who was a supervisor in the Personnel department, and to both Pardo and Guido. He was considering medical retirement, but asked Pardo and Guido about the golden handshake, to which both

responded that "we would be the last to know." Teixeira Test. at 1115. The next day, he changed his mind about medical retirement, and returned to the benefits office. He spoke to Sara Guido on this occasion, and asked her about the golden handshake, to which he received the same general response as he had from Pardo. These conversations with Pardo and Guido probably occurred around January 13 or 14, 1995.

He knew that the MTC and EB were negotiating a new agreement, but he feared that benefits would decrease, and that the "Magic 85" retirement incentive which already existed would be eliminated. Teixeira did not talk to the MTC about the subjects of collective bargaining, though he had been an officer of one of its constituent locals, because he knew that in negotiations the MTC "wanted the world, but they [were] never going to get it." Teixeira Test. at 1141. In his mind, Mr. Teixeira drew the same line that the Court now draws between what the union was negotiating for and what the company had under serious consideration at the time: it is the latter that may require disclosure. Mr. Teixeira testified that had he known that a golden handshake was being seriously considered by EB, he would have delayed his retirement until at least October 1995, at which point he would have reached thirty-five years of service, and he could have retired with the maximum pension benefits. Even though he was receiving no income at the time of his retirement, and had not been for a number of years, Teixeira indicated that he would have been able to "hold on" for the additional months. Mr. Teixeira could not provide any specifics as to how he would be able to achieve this, however, because his wife was in charge of the family finances.

The Court finds that General Dynamics did make some affirmative misrepresentations to Teixeira. Although the financial analysis of the MTC golden handshake had not yet been prepared at the time Mr. Teixeira was making his inquiries, Marie

Pardo knew much more factual information about the status of the deliberations than she disclosed. Two of the *Ballone* factors militate in favor of a finding of fiduciary breach: Mr. Teixeira was not privy to much of the "mix of information" available to the general EB population, such as the EB News and the JPPC Updates, because he was out on unpaid leave for most of the relevant period, and his situation rendered him particularly dependent upon the benefits counselors for truthful information. Further, the fact that Mr. Teixeira began receiving social security disability benefits in January makes it more likely that he would have been able to remain on EB's employment lists, without receiving any income, until the retirement incentives were announced. His inquiries, however, pre-date "serious consideration" by almost four months, and while Ms. Pardo's response to his questions was clearly not an accurate statement of her knowledge at the time, it was not couched as a guarantee supported by specific factual assurances, as identified in *Ballone.* While Pardo's statement was untruthful, and the ramifications to Mr. Teixeira were potentially harmful, his inquiries were too early, and the responses too vague, to be material in these circumstances. Mr. Teixeira could have stayed on as an employee, and while he ran the risk of losing benefits through the collective bargaining process, he falls into the category of risk-averse employees who simply guessed wrong about the likely results of collective bargaining. The Court is not persuaded that any fiduciary breach is shown in these circumstances.

### Anthony DiMella

Mr. DiMella was a salaried employee at the Windsor Locks facility who retired on May 1, 1995, after receiving a lay-off notice effective April 27, 1995. Beginning in the summer of 1994, Mr. DiMella began asking his supervisor, Kelly, whether he had heard anything about the possibility of a golden handshake. Although the exact wording of his inquiries was disputed, the Court credits Mr. DiMella's testimony that he asked something to the effect of "is a golden handshake coming down the pike?" Mr. DiMella's supervisor told him to speak to Vicki Brown, the HR director at the Windsor site where he worked. When he asked Ms. Brown if retirement incentives were possible, she responded "not that I know of." She told him to call Marie Pardo at the benefits office in Groton, which he did in December of 1994. She also said "not that I know of" in response to his inquiries regarding the possibility of a golden handshake. DiMella testified that he had also spoken with Sara Guido on several occasions beginning in January 1995, when he called her on the phone and asked her if a golden handshake was "coming down the pike." She responded "not that I know of." DiMella Test. at 1234. In March, when he went to sign his retirement papers, he asked Guido one final time about whether a golden handshake would be instituted, to which she responded "I'm sorry, no." Ms. Guido did not testify at trial, and as her supervisor, Marie Pardo, was less than consistent in her testimony of what she instructed her employees to say, the Court accepts Mr. DiMella's version of events.

Mr. DiMella was a lay-off volunteer, and could have remained at Electric Boat. He chose instead to retire, as he was close to retirement age and by retiring he could save the jobs of younger people. The Court finds credible his testimony that he would have delayed his retirement had he known about the consideration of the golden handshake, as he was given the opportunity to remain employed by his supervisor Gary Jackson. Mr. DiMella, however, believed no golden handshake was "in sight" for the EB employees, as he had been told by "everyone from upper management on down" that no golden handshakes would be forthcoming. DiMella Test. at 1248. While defendant at trial sought to impeach Mr. DiMella with deposition testimony indicating that he had not relied on Pardo or Guido's statements in making his decision to retire, his trial testi-

mony demonstrates that he had not "relied" on their statements simply because they did not differ from anything he had heard from either Brown or Kelly. While the deposition testimony indicates that he may not have shared defense counsel's understanding of the word "rely," this alone does not mean that the statements about the golden handshake were therefore immaterial to him.

Instead, Mr. DiMella is the classic example of an employee searching every avenue, in order to track down the truth of the rumors that permeated the workplace at Electric Boat. In contrast to some of the Phase I plaintiffs, who made one general inquiry and then made their decision to retire, Mr. DiMella kept asking specific questions about the golden handshake, because as he testified, at Electric Boat "every month, everything changes." DiMella Test. at 1251. Mr. DiMella, therefore, is the obverse of Mr. Carroll, discussed above, in that his claim does not rely on any "duty to update" beneficiaries based on a single inquiry. His memory may not be pristine as to the exact wording of his inquiries, but it is clear that he was asking directly about the possibility of golden handshakes—and not receiving complete and accurate information in return. While the responses of the various EB officials ("not that I know of") may have been technically accurate, in this situation verbal slight-of-hand used to avoid the import of a question has the same effect as an affirmative misrepresentation. In addition, Ms. Guido's statement to Mr. DiMella in March, to the effect that no golden handshake was being offered at all, constituted an affirmative misrepresentation, not just a failure to provide complete information, given what Ms. Guido's supervisor (Pardo) knew about the attention being given to an MTC golden handshake.

This statement, however, occurred more than two months before June 1, the date the Court has identified as the earliest possible point where a golden handshake was under "serious consideration" for sala-

ried employees. The four factors of the *Ballone* analysis, therefore, must be analyzed. At the time of Mr. DiMella's inquiry, no calculation of pension liabilities for the salaried workforce had been done, and Norman remained focused on the MTC, so the statements by Guido and Pardo could not be said to be assurances that significantly misrepresented the status of internal deliberations regarding a non-MTC golden handshake. Further, Mr. DiMella was aware of other information, aside from the statements of the benefits counselors, that bore on the likelihood of retirement incentives being offered to salaried employees. At trial he stated that he believed that a golden handshake for the MTC would be followed by one for salaried workers. *Id.* at 1227, 1230. He had heard about the Land Systems golden handshake, and he had heard rumors that the MTC was negotiating for a similar package for its members. *Id.* at 1224.

While the information of which Mr. DiMella was aware was not factual or specific, even if EB had chosen the course of full disclosure of available information—that the MTC golden handshake had been the subject of extended MTC-management pre-bargaining discussions, that the pension liabilities had been costed out, and that EB anticipated it would be a priority union demand in the negotiations—the information available to EB did not differ significantly from the general knowledge Mr. DiMella had. DiMella testified that had he believed that the MTC was going to get a golden handshake in the summer of 1995, and the salaried employees immediately after, he would have postponed his retirement. *Id.* at 1254. Information that would have provided the factual underpinning for such a belief, however, was not available at the time of his inquiry, and to find the employer liable for failing to provide it would impose no less than the duty of clairvoyance specifically rejected in *Mullins,* 23 F.3d at 669. The representations to Mr. DiMella were not material

under *Ballone*, and therefore his fiduciary duty claim fails.

### James Molonson

Mr. Molonson was an MTC member who retired effective May 1, 1995. In January of 1995, he asked Marie Pardo if a golden handshake was under consideration by the company, and he asked his supervisors the same question in March and April 1995. Everyone he inquired of told him that they knew nothing of any such plans. While the golden handshake was under "serious consideration" for the MTC by the beginning of May, 1995, Mr. Molonson steadfastly testified that he would not have delayed his retirement unless he had known that the golden handshake was a "done deal." Such assurances would have been impossible at the stage of his inquiries. Therefore, any misrepresentations to Mr. Molonson cannot be material.

### Donald Felicetti

Mr. Felicetti was a salaried employee who managed other workers at EB's Quonset Point, Rhode Island facility, and who retired on October 1, 1994. The employees under his supervision asked him questions regarding their employment, including benefits questions. He testified that benefits questions were addressed through the "chain of command," in which he was the first link. After his direct reports began asking questions about the possibility of golden handshakes, he raised the issue with his supervisor in the beginning of June, 1994. His supervisor did not know of any early retirement incentives, and directed him to check with Human Resources. He spoke with Marie Pardo there, and asked about the possibility of a golden handshake, both for himself and for his subordinates. Pardo told him that she did not know about the possibility of a golden handshake. Felicetti also spoke with a Ms. Tucker (the record is unclear as to whether this is the same individual referred to as Ms. Turner by other employees at the Quonset facility), the HR representative at his facility, as well as the manager of HR at the Quonset facility.

Both individuals told him that they had not heard of anything regarding the golden handshake. Mr. Felicetti testified that he retired because he was no longer getting satisfaction from his job, and he wanted to spend more time with his family, but that he was in a position to delay his retirement, and he would have done so had he known that EB was discussing the possibility of offering a golden handshake.

While inconsistencies between his testimony at trial and his statements under oath at deposition could cast doubt on whether and when Mr. Felicetti mentioned the golden handshake to Marie Pardo, and while the reliability of his memory as to specifics is questionable, it is clear to the Court that he did inquire about a golden handshake, and on more than one occasion. At the time he made his inquiries in the summer of 1994, however, the costs of providing a golden handshake had not been costed out for any population, General Dynamics was not aware of any discussions of early retirement incentives for the MTC, and Don Norman was not even considering the salaried employees in the JPPC Golden Handshake Subcommittee. At that point, there was little that General Dynamics could have disclosed regarding its plans for the salaried population. Pardo was aware at that point about the MTC golden handshake discussions, and she had attended a meeting where Hapke led a discussion that included the question of which population groups should be eligible for a golden handshake, if one were offered. P.Ex. 42. Such "brainstorming" sessions, however, are precisely the sort of internal deliberations that need not be disclosed. Under *Ballone*, any misrepresentations were immaterial, because they did not significantly misstate the status of internal deliberations or include any factual assurances, and Mr. Felicetti's inquiries occurred too early to trigger any fiduciary duties on the part of General Dynamics.

### Nola Bunkley

Ms. Bunkley was a salaried executive secretary in the legal department at the

Groton facility who retired on March 1, 1995. She testified that she worked for Meryl Smith, an attorney who retired at the end of 1994, and that she was afraid she would be down-graded or laid off as a result, so she began to consider retirement. While Ms. Bunkley had heard "office gossip" relating to the possibility of a golden handshake, she did not ask anyone at the Benefits office or her supervisor about early retirement incentives. Rather, she discussed the rumors with a group of employees in the hallway, all of whom concluded that there would be no such retirement incentive, and asked an unnamed supervisor, who responded that he thought there would not be a golden handshake this year, meaning the summer or fall of 1994. Bunkley Test. at 1305. She began meeting with Marie Pardo in the benefits office in January of 1995, and met with her approximately three times. She admitted that she never asked Ms. Pardo specifically about the possibility of golden handshakes or retirement incentives; instead, they discussed the current benefits in the current plan, and she was given a straightforward explanation of her options. Pardo did, however, advise her to wait until the end of the month, even though Bunkley was "perfectly prepared" to retire mid-month, because she would receive more money.

Ms. Bunkley's very broad inquiries occurred prior to "serious consideration" of golden handshakes even for the MTC, and were directed at co-workers and colleagues, rather than benefits officers. While she testified that there was no reason she could not have delayed her retirement until July 20, 1995 when the golden handshake for salaried employees was announced, her rationale for retiring related to her fear that Mr. Smith's retirement would cause her to be demoted or laid off. She had been "downgraded" once before and worked her way back up, but she testified that she "didn't want to go through it again." Her willingness to retire in the middle of the month also indicates her eagerness to retire sooner, rather than later. After balancing the *Ballone* factors, including the stage of internal decision-making and the positions of the individuals to whom Ms. Bunkley spoke, the Court concludes that no breach of fiduciary duty occurred.

## Thomas Fagan

Mr. Fagan retired on February 1, 1995, but had last worked at Electric Boat in November of 1977. He had been out on a workers' compensation claim since that time, and although he was an MTC member, he was not aware of the contract negotiations or of any discussions regarding a golden handshake. Mr. Fagan had settled his workers' compensation case at some point in early 1995, and retired immediately thereafter. Although he testified that he thought he could have returned to work had he chosen to do so, General Dynamics' principal workers' compensation attorney testified that it was General Dynamics' practice to require employees receiving lump-sum worker compensation settlements to retire. While the actual papers filed with the workers' compensation commission outlining the settlement do not reference this requirement, Attorney Kway testified credibly as to General Dynamics' practice, and the logical basis for it. Therefore, even had Mr. Fagan known about the possibility of the golden handshake, the Court concludes that he would not have been able to take advantage of it. Any misrepresentations were therefore not material, and his fiduciary duty claim fails.

## Ernest Perkins

Mr. Perkins was a salaried employee located in the Newport, Rhode Island engineering office where approximately eighty to ninety other engineering employees worked. Rumors regarding the golden handshake were rampant in the office, and as "Technical Lead," he was frequently asked about the possibility by employees in the office. He, in turn, frequently asked his supervisor, Hal Drury, and his

office colleague, Jane Steele, about such a possibility beginning in December of 1994, and he continued making such inquiries through April of 1995. Neither Drury nor Steele had any knowledge of golden handshakes being offered to salaried employees. Mr. Perkins spoke with Ms. Pardo about retirement in general in December of 1994, and sought more specifics regarding his own retirement in February of 1995, and while his primary reason for speaking to Ms. Pardo was to determine if she had information he should consider in making his own retirement decision, he also was seeking information to assist his co-workers, as he felt he had a leadership role in the office and was concerned about their well-being. In February of 1995, he called Pardo and informed her he was considering the summer of 1995 as a possible retirement time frame, and he specifically asked her about the possibility of golden handshakes being offered to salaried personnel. Pardo responded to the effect that "she did not know of anything." Perkins Test. at 1324. Mr. Perkins also spoke with Sara Guido in the Benefits Office in April of 1995, although he did not ask her about the possibility of benefits enhancements, because he felt that if Marie Pardo became aware of anything, she would inform him. He also continued to ask Drury and Steele for their opinion on the subject, although they had no further information to provide him. The continuous nature of Mr. Perkins' inquiries supports his testimony that he had not selected a certain retirement date, and that his time frame was flexible. Mr. Perkins was gathering information and evaluating the data available, in order to determine when would be the best time to retire, much as a stock investor evaluates the market in order to determine the best time to buy.

Perkins had no MTC people working in his office, and he testified that the MTC discussions and negotiations had little effect on him. He saw the rationale of offering the golden handshake to union members because of the need to reduce the headcount in those areas while still maintaining critical skills, and he thought it possible that the option would be considered for salaried employees. His testimony demonstrated, however, that he viewed the salaried population as quite different from the other employee groups, in terms of use of retirement incentives and the critical skills required, and he eventually decided that a possible MTC golden handshake would not be linked to a similar offer to salaried employees. Thus, although the MTC golden handshake was under serious consideration at the time he spoke with Guido, the failure to disclose that fact to him was not a material misrepresentation.

As to the "mix of information" factor in *Ballone,* Mr. Perkins did not read the EB News regularly, as it often did not reach his facility, and while he may have seen the Norman interview in the July 1994 issue, he read it as applying more to hourly workers than salaried employees. Based on his evaluation of all the factors, he selected his retirement options in April of 1995, and he retired effective May 1, 1995.

As was the case with Mr. Felicetti, Mr. Perkins' role as a conduit of information to other employees exponentially increases the harm resulting from any misleading statements or omissions made to him. Yet his primary inquiries occurred before the company seriously considered extending the golden handshake to salaried personnel, and his actual retirement date preceded serious consideration by a month. In March of 1995, when he made his inquiries of Pardo, retirement incentives for the MTC were not yet under serious consideration, and those most involved in this decision had not expanded their thinking to include the salaried employee. Further, as noted above, Mr. Perkins testified that a golden handshake for the MTC and one for the salaried employees "were basically separate in [his] mind," and that while he saw the logic for offering a retirement incentive to the MTC, the critical skills

needed for yard work and for the work at his facility were "totally different." Perkins Test. at 1357–58.

As was the case with Mr. DiMella, even had the decision-making process at EB been perfectly transparent, the factual information that could have been disclosed—that the MTC and EB had discussed golden handshakes in the non-bargaining context, and that an actuarial analysis for the MTC workforce had been conducted—has not been shown to be sufficiently material to salaried employees like Mr. Perkins to make the failure to disclose it a fiduciary breach. As the Court has determined that no "duty to update" should attach in the context of communications regarding changes to pension plans, the fact that Mr. Perkins' actual retirement preceded serious consideration by only a month is irrelevant, as he did not seek further information regarding possible pension enhancements at that time. The Court can discern no reasoned basis for imposing a duty to disclose in these circumstances, just because the timing is close. Therefore, despite Mr. Perkins' diligent efforts to ascertain the truth regarding the golden handshake rumors, the Court concludes that he falls in the same category as Mr. DiMella and Mr. Felicetti, in that no fiduciary breach occurred.

### Linwood Lamb

Mr. Lamb was an hourly MTC employee whose retirement was effective on February 1, 1995. While he was an MTC member and a previous officer of the Boilermakers local, Mr. Lamb's relationship with the union was strained due to his crossing the picket line during the 1988 strike. Lamb testified that he began considering retiring approximately two to three years prior, as he was "tired of working." Instead of asking the union, Mr. Lamb asked several supervisors about the possibility of retirement enhancements, none of whom had any information. In November of 1994, Mr. Lamb went to the Benefits Office to fill out his retirement papers, and he asked Sara Guido if she had heard anything about the golden handshake; she responded that it was "just a rumor," and the subject was dropped. The Court finds Lamb's testimony credible on this point. Lamb asked Ms. Guido similar questions on at least one other occasion, and received a similar response. Up until the date of his retirement, Mr. Lamb continued to ask his supervisors whether a golden handshake was offered; his supervisors had no information, and did not refer him to anyone else.

While he was aware that the MTC and EB were negotiating "something" regarding the golden handshake, Lamb was concerned that he might actually lose benefits as a result of the negotiations, as he had "no faith in the bargaining union." Lamb Test. at 1406. Mr. Lamb testified that he had not read any of the publications that discussed the possibility of retirement enhancements, including the Norman interview in the EB News or any of the updates from the JPPC about the Golden Handshake Subcommittee. At trial, he stated that had he been aware of the information in these publications he would have delayed his retirement, but the credibility of this statement was impeached by his deposition testimony, indicated that simply knowing the company was "discussing" a golden handshake would have been insufficient to persuade him to continue working. Lamb Test. at 1432. He acknowledged at trial that he would have needed some fairly definite assurances or promises regarding potential retirement incentives in order to postpone his date of retirement.

He indicated at trial that he was "not a good reader," which demonstrates the importance of communications from front-line benefits representatives. Beneficiaries with decreased literacy such as Mr. Lamb, or unsophisticated beneficiaries less able to sort through a myriad of publications and pronouncements to discern the company's position on an issue, should be able to rely on the very people whom the employer has designated as the primary

source of information. As was the case with Mr. DiMella, Ms. Guido's statement to Mr. Lamb that the golden handshake was "just a rumor" was more than a failure to provide complete information; she affirmatively misrepresented the company's position, as her own supervisor had attended the Golden Handshake Subcommittee meeting but a month before. Even the Vice–President of Human Resources saw no reason that such basic information regarding the possibility of a golden handshake could not be communicated to employees. Similarly, no evidence was offered as to why once the company spoke on the topic of future retirement benefit changes, as EB did in Norman's EB News interview or through the JPPC Updates, the benefits office could not or should not provide at least equivalent information.

Given the nature of the affirmative misrepresentation made by Guido, the closeness in timing of Mr. Lamb's request, and his relationship of trust and confidence with the benefits counselors based on his particular need for complete and accurate verbal information from them, combined with the fact that he may not have had access to the other "mix of information" available, *Ballone* might allow a finding of a material misrepresentation in these circumstances. The Court concludes otherwise, however, because although Ms. Guido misrepresented the status of the MTC discussions, the Court is persuaded that it was not material to Mr. Lamb's decision to retire. At trial, Lamb was very equivocal as to whether he would have stayed had the information given to him been less than a definite assurance that a golden handshake offer was forthcoming. Lamb Test. at 1436. At the time Lamb made his inquiries, and even at the time of his retirement, the golden handshake had been discussed, but economic negotiations had not begun, nor had the economic liabilities of such a program been calculated. Therefore, even had Guido disclosed the status of the union-management discourse as of November 1994 or February 1995, the Court is unpersuaded that it would

have changed Mr. Lamb's decision. As any misrepresentations were thus not material, no fiduciary breach has been shown.

### Edward McElroy

Edward McElroy was a salaried employee at the time of his retirement on January 1, 1995. Mr. McElroy worked at Quonset Point, away from the main Groton facility, and began pursuing information about retirement incentives after reading the Norman interview in the 1994 summer issue of EB News. Mr. McElroy was aware of the MTC discussions regarding a possible golden handshake, and at some point after the EB News came out he asked his supervisor if there were any similar "negotiations" to extend such a plan to salaried employees. When his supervisor did not know, McElroy asked him to inquire up the "chain of command" and find out if any of his superiors were aware of any such plan. McElroy testified that he was seeking to confirm the accuracy of Don Norman's statements, and to find out the status of discussions with the MTC. McElroy even called his supervisor to ask for any new information while he was out on sick leave for a period of time in September of 1994. McElroy also inquired of Charlene Hunter in the Quonset Point human resources office, because Norman was in that department, and asked her "if she knew of any salary negotiations going on for salary personnel regarding a golden handshake." McElroy Test. at 1456. She responded that she did not know if any negotiations were going on for salaried employees. He spoke to her on at least one occasion after that, but received no further information.

His testimony demonstrated that he continued to make similar inquiries up until the day he retired, but that after his September 1994 meeting with Hunter, he primarily inquired of his supervisors, and others in his "chain of command." He testified credibly that he simply wanted to know whether those in higher corporate echelons were considering the possibility of offering early retirement incentives to

salaried people. No one he spoke to could provide any information beyond that contained in Norman's statement, and no one could offer any prediction as to whether salaried employees would be included within the ambit of any possible golden handshake offer. In fact, nobody told McElroy that there was any activity on the subject at all by upper management, whether with respect to the MTC or to salaried employees, despite his persistent and specific inquiries.

Mr. McElroy was credible in his testimony that he would have delayed his retirement had he been made aware of even the faintest ripples in the water indicating that a golden handshake may be offered to salaried employees. Mr. McElroy did not strike the Court as a risk-averse individual, and he could have easily continued working had there been a possibility of benefit to him.

Mr. McElroy's case suffers from the same flaw as many of his fellow plaintiffs, however, in that his inquiries were simply too early to trigger any fiduciary obligations. Although Mr. McElroy was seeking information regarding the MTC package, for which the consideration had progressed further, in December of 1994 there was very little information to disclose, other than the deliberations of the JPPC. Further, his last conversation with the benefits counselor was in September of 1994, and all his inquiries after that time went to his supervisors. As the Court has previously noted, when an employer specifically designates particular individuals as the best source of information, there is a concomitant duty to ensure that they have accurate and complete information to provide, such that omissions or misstatements by benefits counselors have a particular import. The same cannot be said for supervisors, who do not have this sort of "special relationship" with their subordinates.

Mr. McElroy's inquiries pre-dated serious consideration substantially, he did not have a "special relationship" of trust and confidence for the purposes of benefits disclosures with his supervisors, and he was aware of the "mix of information" that was available regarding the possibility of golden handshakes, including the Norman interview and the Land Systems package. Although his inquiries were pointed, the Court concludes that balancing the factors laid out in *Ballone,* the failure to provide Mr. McElroy with further information was not a material misrepresentation.

### John Munton

Mr. Munton was a member of the MDA who retired effective September 1, 1995. He testified that after the news broke regarding the MTC contract and the golden handshake, he began asking supervisors and individuals involved in the MDA about the possibility of a similar program being extended to the draftsmen. He also spoke to Sara Guido at some point in mid-July, and asked her about the possibility of the MDA receiving the same offer in their contract negotiations. According to Munton, Guido ignored his question, and changed the subject, and he assumed that since she did not answer, "it wasn't within her realm." Munton Test. at 1517. He continued to ask supervisors, and also spoke to Lee Vincent on his last day during the check-out procedure, but he did not speak to anyone else in the benefits office or in human resources.

MDA economic negotiations began in May of 1996 at the earliest, and the record is devoid of evidence that any prior consideration was given to extending golden handshakes to MDA employees. In fact, the president of the MDA, Melvin Olssen, testified that from 1993 through 1996, the union was recruiting people from throughout the program, and had started a training program to bring people out of the yard, the need for technical employees and draftsmen was so great. In addition, as noted above, the need to retain the physical agility of the younger employees was not an issue with MDA employees, as EB and the union were interested in keeping the skills of the more experienced employ-

ees. These differences between the MTC and MDA in this regard demonstrate that including a retirement incentive program in the MDA contract was not a near inevitability, as was the case with the MTC, and that offering such an incentive to the MTC did not necessarily presage a similar offering to the MDA.

Although the MDA golden handshake was costed out along with the salaried and non-union hourly employee groups, *see* Jt. Ex. 411, this fact alone is insufficient to render any failure to disclose it material. Any changes to the pension plan could only be implemented pursuant to the collective bargaining process, and absent any of the special factors that were present in the case of the MTC, the Court is reluctant to impose an obligation to disclose information prior to even the commencement of collective bargaining. The Court therefore concludes that Mr. Munton has failed to prove any material misrepresentations on the part of EB, given that his inquiries came nearly a year prior to the point of "serious consideration" for the MDA, and the numerous differences between the MDA and MTC.

### Kenneth Martin

Mr. Martin retired effective February 1, 1995, at which time he was a salaried employee working at the Navy sub-base distant from the shipyard. He began asking his supervisors and co-workers about golden handshakes some time in December 1994, and went to speak with Sara Guido about retirement in that same month. When he inquired about whether early retirement incentives might be offered to salaried employees, she told him that there were rumors, but she knew nothing official. Mr. Martin acknowledged on cross-examination that he had told his supervisor several months previous to his conversation with Ms. Guido that he wanted to retire, and that he probably would have retired anyway even had he been told that EB was considering a golden handshake for MTC employees. Mr. Martin was another employee who, like Mr. Molonson,

needed rather definite assurances that a golden handshake would be offered in order to persuade him to delay his retirement, and he needed the additional promise that it would apply to salaried workers. Although Ms. Guido may have misrepresented the state of deliberations over the golden handshake *generally*, as it had definitely progressed beyond the rumor stage at that point, there was no information to convey regarding whether salaried workers would be eligible. Ms. Guido's statements were thus not material to Mr. Martin, and his claim fails.

### Raymond Hudson

■ Raymond Hudson retired effective June 1, 1995 after more than thirty years at Electric Boat. At the time of his retirement, he was a salaried employee working in the purchasing department, located in a shopping center about a mile from the shipyard. He had not heard about the Golden Handshake Subcommittee, nor had he read the EB News interview with Norman in which retirement incentives were discussed, although he had heard about it. He also began hearing rumors that the MTC might get an offer of a golden handshake, and he became interested in the subject. Contemplating retirement, in April of 1995 he went to speak with Sara Guido, and raised the issue with her. He asked her about the rumors that any golden handshake received by the MTC might "trickle down" to salaried people; she responded that she had no knowledge. Hudson then asked if they could speak to Guido's supervisor, Marie Pardo. He repeated his question to Pardo, who stated that she was only aware of the same rumors he had heard, and knew nothing more than that. Pardo did not direct him to speak with anyone else, and he concluded that retirement enhancements were not likely, as he believed Pardo would have known and would have told him about any possibilities. Prior to his meeting at the Benefits office, he had not selected a specific date for retirement, although he had

mentioned May, and Guido suggested that he retire at the end of May.

On his last day of work, May 31, 1995, he again came into the benefits office, and asked to put a letter in his file detailing his request for information on the golden handshake, his willingness to postpone retirement if one were imminent, and relating rumors he had heard that any such offer "would be retroactive to all employees who retire during this calendar year, 1995." Def.Ex. 1489. Hudson then asked to speak with Guido, who was not in, and so he spoke to Pardo instead. Although Pardo cannot remember this second conversation, Hudson claims that he stepped into her office and inquired for a final time about golden handshakes, and received the same answer he had been given before. He is credible on this point, as the letter he delivered confirms that the golden handshake was on his mind that day, while Pardo's inability to remember the incident may be explained by the fact that an average of twenty counseling sessions a day were occurring in the benefits office. Hudson also credibly testified that he did not need any specific assurances or guarantees in order to postpone his retirement; rather, the slightest "ripple" or response suggesting that golden handshakes might be possible for salaried employees would have been sufficient for him.

Hudson's final inquiry came on the day before the point at which General Dynamics began seriously considering extending a golden handshake to the salaried and non-union hourly employees, and at a time when offering retirement incentives to MTC employees was under very serious consideration by GD. In bright-line jurisdictions the fact that Mr. Hudson inquired before changes were under serious consideration may have ended the inquiry, even though his retirement preceded that point by only one day, but in this circuit, *Ballone* requires a balancing of factors. Mr. Hudson did not seek information from his supervisors, but instead asked those individuals that the Court has already recognized as having a special relationship of trust and confidence with employees, the benefits specialists in the human resources department. As for the "mix of information factor," he also worked away from the central Groton facility, and thus was not aware of the JPPC and the deliberations of the Golden Handshake Subcommittee. Hudson Test. at 1570. He had heard about the Norman interview in the EB News and thus was aware that if anything happened, it would occur in 1995, but his limited knowledge only made Pardo's dismissive responses more material, because he reasonably concluded that if she was unaware of any pension changes, none were in the offing.

Analysis of the other considerations laid out in *Ballone* militate in favor of a finding of materiality under these circumstances. Pardo and Guido's statements about prospects for salaried employees, while not deliberate falsehoods, effectively communicated to Hudson that no changes were being considered, and they did not qualify their statements of ignorance by directing him to speak to other individuals, or pointing out that they did not have current information. In fact, Pardo's statement that she was only aware of the same "rumors" he had heard undermined any factual information he may have possessed, because it suggested she considered it just gossip and not worthy of further inquiry. His repeated inquiries notified them that the issue of golden handshakes for salaried employees was of great concern to him, and even Pardo in her trial testimony recognized that some other response was required, as she testified to advising employees that a MTC golden handshake would have to come before any salaried program was offered. Had she so spoken, Mr. Hudson would have at least had additional information to assist him in timing his retirement, but instead he got protestations of ignorance from those specialists who purportedly had the best access to company information.

This conclusion is bolstered by examining how significantly their statements misrepresented the status of internal deliberations at GD. Pardo's statement that she knew of no plans to extend the golden handshake to salaried employees—a statement that Hudson quite reasonably took to mean that it would not occur—were not an accurate reflection of the consideration being given to the idea as of May 31, 1995. In fact, on the day Mr. Hudson retired, Norman presented to top GD management an analysis of the costs of extending the golden handshake beyond the MTC, and although he did not request permission to make such an extension, no further discussion or analyses was required before the extension was ultimately approved on July 12. Mancuso's testimony regarding the first economic parameters meeting on May 8, 1995, demonstrates that broadening the golden handshake to include the salaried and non-union hourly employees was certainly on the minds of some GD officials, thus prompting them to direct Norman to make such calculations. The actuarial calculations regarding the cost of extending retirement incentives to the entire EB population were received by GD on May 9 and 10, 1995, *see* Jt.Ex. 410, 411, and plainly conveyed positive financial data to GD, as there was no debate when Norman eventually did propose extending the golden handshake, days after the MTC contract had been ratified. Further, the very next day Norman requested, and received, approval for an MTC golden handshake.

These internal deliberations, of course, need not be disclosed in specific detail. They do demonstrate, however, that Pardo's characterization of the deliberations as only rumors, and her protestations of ignorance misrepresented the status of internal deliberations, in that they conveyed to Mr. Hudson that nothing actually was happening, when in reality significant consideration was being given to the proposal. Pardo could have sought out additional information from Norman or Hapke; she could have informed Mr. Hudson that contrary to his beliefs she was not the person

best equipped to answer his questions; she even could have responded as she claimed she did—that in her view no salaried employees would be offered golden handshakes until the MTC contract was finalized. In the Court's view, any of these responses would have been sufficient to persuade Mr. Hudson to delay his retirement, given the minimal quantum of information he was seeking. Given the propinquity in timing, the mix of information available to Mr. Hudson, the special status of Marie Pardo and Sara Guido, how Pardo's statements conveyed the wrong impression regarding the status of internal deliberations, and Mr. Hudson's diligent efforts to ascertain the truth, the Court is persuaded that material misrepresentations have been proven. Accordingly, Mr. Hudson has prevailed in his claim of fiduciary breach under ERISA.

### John O'Shea

Mr. O'Shea was a salaried employee who also retired effective June 1, 1995. He began considering retirement in May of 1994, at which time he asked a woman in the Benefits office about the possibility of early retirement incentives. While O'Shea decided not to retire that year, he continued to follow the rumors about golden handshakes. He asked his supervisor, Mr. White, on several occasions from February through April of 1995 about retirement enhancements; his supervisor either dismissed such talk as rumors, or told him that he did not know. O'Shea also asked Sara Guido about retirement incentives when he met with her, first on April 24, 1995 and then again when he brought his wife to sign the required paperwork on May 24, 1995. On both occasions, Ms. Guido said "[n]o, that's just a rumor." O'Shea Test. at 1621–22. He asked his supervisor one last time when he returned from vacation on May 30, and on May 31, his last day at work, before he went to the benefits office to perform the final checkout, he asked White whether he could come back to work if he heard from the benefits office that a golden handshake

was possible. White told him that he would be glad to have him back on the job, and O'Shea went to meet with Ms. Vincent, like every other retiring employee. He asked her as well, and when no information was forthcoming, he proceeded with his retirement. His repeated inquiries and his demeanor at trial demonstrated that Mr. O'Shea, like Mr. Hudson, did not need concrete particulars in order to delay his retirement; at the faintest suggestion, he would have delayed his retirement in order to find out further information.

Mr. O'Shea's inquiries of Guido predated the point of serious consideration of retirement incentives for salaried employees by approximately a week, as he testified that his last conversation with Sara Guido occurred on May 24th. O'Shea Test. at 1622. Like Mr. Hudson, the proximity in timing, the fact that O'Shea worked away from the main facility and thus did not have access to the same "mix of information," and the state of internal deliberations as of May 24, 1995 weigh in favor of a finding of materiality, given that all the potential liabilities had been costed out and final approval for the MTC was only a week away. Further, the misleading nature of Ms. Guido's dismissive responses resembles the "factual assurances" discussed in *Ballone,* in that her statement that a salaried golden handshake was "just a rumor" effectively relegated the possibility to the realm of idle chatter and supposition with no foundation in reality. While Guido may have actually believed that golden handshakes for salaried employees were simply "just a rumor," the facts developed at trial demonstrate that she had no basis for speaking so definitively without confirming her information or qualifying her statement in some way, and her statements constituted a material misrepresentation to Mr. O'Shea. The Court therefore concludes that GD breached its fiduciary duties in communicating to him about potential pension changes.

## IV. CONCLUSION

In summary, the Court has reached the following conclusions. First, General Dynamics was acting in its fiduciary capacity as Plan Administrator, not a Settlor, when it communicated with beneficiaries about possible benefit changes. Fiduciary duties therefore attach to these communications. Second, under applicable Second Circuit law, neither a specific inquiry referencing "golden handshakes" by the beneficiary nor a deliberate falsehood by the fiduciary or its representatives is a predicate to finding an ERISA violation. Third, while "serious consideration" of plan changes is not dispositive of all plaintiffs' claims, the Court has determined that offering retirement incentives to the MTC workforce was being seriously considered as of May 2, 1995; extending it to the salaried and non-union hourly workforce was being seriously considered as of June 1, 1995; and for the MDA in mid-July, 1996. Fourth, the Court has determined that a "duty to update" prior to the point of serious consideration would be too onerous a burden for a fiduciary to carry in these circumstances, and thus the relevant date for assessing the adequacy of any communications is the date the beneficiary spoke with human resources personnel, not the actual date of retirement, unless the fiduciary has promised to provide further information. Finally, the Court has weighed the factors set out in *Ballone* to determine that General Dynamics did not violate its fiduciary duties under ERISA in its communications with any of the individual plaintiffs except Raymond Hudson and John O'Shea.

Accordingly, Defendants' Motions for Judgment Under the *Vartanian* Decision and Under the *Pocchia* Decision [doc. # 145, doc. # 130] are DENIED.

The Clerk is directed to enter judgment in favor of the defendant and against the following plaintiffs: Kenneth Brunelli, Jane Imdahl, Larry Schuhardt, Robert Charbonneau, William Barlow, William Carroll, Thomas Teixeira, Anthony DiMella, James Molonson, Donald Felicetti, Ed-

ward McElroy, Nola Bunkley, Thomas Fagan, Ernest Perkins, Linwood Lamb, John Munton, and Kenneth Martin. The clerk is directed to enter judgment in favor of the following plaintiffs on liability: Raymond Hudson and John O'Shea. A hearing in damages will be scheduled forthwith.

The Clerk is directed to CLOSE the following cases: *Barlow v. General Dynamics*, 3:96cv1321, *Teixeira v. General Dynamics*, 3:96cv1325, and *Molonson v. General Dynamics*, 3:96cv1328.

IT IS SO ORDERED.